IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RACHEL KINGSLEY,          :   CIVIL ACTION NO.
                            :   1:15-CV-4419-TWT-JSA
        Plaintiff,        :
                            :
        v.               :
                            :
TELLWORKS COMMUNICATIONS, :
LLC, EAGLE PARKING, LLC, and : **F I N A L   R E P O R T   A N D**
EMPIRE PARKING SERVICES, INC., : **RECOMMENDATION  ON  A**
                            : **MOTION  FOR  SUMMARY**
        Defendants.      : **<u>JUDGMENT</u>**

Plaintiff Rachel Kingsley ("Plaintiff" or "Kingsley") filed the above-styled civil action on December 21, 2015. Plaintiff alleges that she was employed by Defendants Tellworks Communications, LLC ("Tellworks"), Eagle Parking, LLC ("Eagle"), and Empire Parking Services, Inc. ("Empire") from October 26, 2012 until January 24, 2014, when her employment was terminated. Plaintiff claims that she was discriminated against on the basis of her gender and pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"), and the Civil Rights Act of 1991. Plaintiff also claims that Defendants interfered with Plaintiff's rights under the Family Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA") to take time off from work as a result of her pregnancy and that Defendants retaliated against her for exercising her rights under the FMLA.

The action is before the Court on the Plaintiff's Motion for Partial Summary Judgment [39] and Defendants' Motion for Summary Judgment [42]. For the reasons discussed below, the undersigned **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment [39] and Defendants' Motion for Summary Judgment [42] be **DENIED**, and that Plaintiff's claims be allowed to proceed.

## I.     FACTS

Unless otherwise indicated, the Court draws the following facts from "Plaintiff's Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried" [39-2] ("Pl. SMF"), "Defendants' Statement of Material Facts to Which There Is No Genuine Issue to be Tried" [42-2] ("Def. SMF"), "Defendants' Response to Plaintiff's Statement of Material Facts to Which There Exists No Genuine Issue to be Tried" [57] ("Def. Resp. SMF"), "Plaintiff's Response to Defendant's [sic] Statement of Undisputed Material Facts Upon Which There Exists No Genuine Issue to be Tried" [58-1] ("Pl. Resp. SMF"), "Plaintiff's Statement of Additional Facts in Support of her Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment" [58-2] ("Pl. Add. SMF"), and "Defendants' Response to Plaintiff's Statement of Additional Facts in Support of her Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment" [62-2] ("Def. Resp. Add. SMF").

For those facts submitted by the Defendant that are supported by citations to record evidence, and that the Plaintiff has not specifically disputed and refuted with citations to admissible record evidence showing a genuine dispute of fact, the Court deems those facts admitted, pursuant to Local Rule 56.1B. *See* LR 56.1(B)(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).").

The Court has excluded assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to admissible evidence in the record or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B, NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe*

3

*v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

Both parties have objected to some of the opposing party's proffered facts on the ground that an asserted fact is not relevant or material to the claims and defenses presented in this case. The Court nevertheless includes some of those facts because they provide background information that is helpful to explain the context of the parties' asserted facts and contentions. The parties also attempt to dispute some of the opposing party's proffered facts, but the majority of these disputes are over minor and immaterial issues. Accordingly, the Court will not rule on each and every objection or dispute presented by the parties, and will discuss those objections and disputes in the analysis section only when necessary to do so regarding a genuine dispute of a material issue of fact.

Eagle, Tellworks, and Empire exist and purport to operate independently of each other. Def. SMF at ¶ 1. However, they all share a CEO and a co-owner, Jared Krumper.[1] Pl. SMF at ¶ 2; Pl. Resp. SMF at ¶ 1. In addition, while Plaintiff was

---

[1]Defendants dispute this, claiming on the basis of evidence conflicting with that cited by Plaintiff that William Schmeelk is the CEO of Empire and that Krumper does not have a formal title with respect to his role in the three companies. Def. Resp. SMF at ¶ 2. However, because Plaintiff has cited to evidence establishing that Krumper is the CEO of all three companies, the Court assumes this to be true for purposes of Defendants' Motion. *See* Underwood Dep. [51] at 11-12.

employed by Defendants, Christo Makrides was a co-owner and the CFO of Defendants Tellworks and Eagle, and he provided strategic planning and was a consultant to Defendant Empire. Pl. SMF at ¶ 3; Pl. Resp. SMF at ¶ 1. The three companies share office space, and each pays a prorated share of the rent. Def. SMF at ¶ 2; Pl. Resp. SMF at ¶ 1. In addition, Eagle has operations in Tennessee, and therefore has separate office space from the other companies, and Tellworks has operations in various states, and therefore also maintains some separate office space. Def. Resp. SMF at ¶ 5. As of 2016, ninety percent of Eagle's locations were in the metro-Atlanta area, within 75 miles of its corporate office. Pl. SMF at ¶ 29; Krumper Dep. at 16-17. Also in 2016, Defendants as a whole employed more than 50 employees.[2] Pl. SMF at ¶ 30.

Although the Defendants have some shared ownership, there are also individuals with ownership in only one of the three Defendants. Def. SMF at ¶ 3. For example, Tellworks is co-owned by Marcus Evans and Bobby Glustrom, neither of whom have an ownership stake in Eagle or Empire. Def. SMF at ¶ 3. Similarly,

---

[2]To the extent Plaintiff asserts proposed facts as to the geographical makeup of Defendants' workforces during the period of her employ, the Court finds that to be unsupported by the evidence cited. Plaintiff relies solely on testimony from Krumper in 2016 stating that, as of that time, ninety percent of Eagle's operations (which employ the most of all three Defendants) were in the Atlanta area. This testimony as to the geographic distribution of Eagle's business in 2016 does not necessarily establish what the situation was several years earlier.

Empire is co-owned by William Schmeelk, who has no ownership stake in either Tellworks or Eagle. Def. SMF at ¶ 3. The three Defendants purport to be legally unrelated and to perform different functions. Def. SMF at ¶¶ 4-5. Empire is a vehicle mobilization company; Tellworks is a forward and reverse logistics company that specializes in telecom materials; and Eagle was founded as a valet parking company, and also manages surface parking lots. Def. SMF at ¶ 5.

As of 2016, Cyrus Parsifal was the COO of Eagle and ran its day-to-day operations.[3] Def. SMF at ¶ 10; Parsifal Dep. at 6. Parsifal does not have an ownership stake in any of the three Defendant companies. Def. SMF at ¶ 11. Parsifal has never been employed by Tellworks, but he provides sales consulting to Empire, for which he receives a separate paycheck from Empire. Def. SMF at ¶ 12. In fact, Parsifal is paid the same amounts for his work with Empire and with Eagle, and he splits his time evenly between the two companies. Pl. Resp. SMF at ¶ 12; Parsifal Dep. at 71. Although Parsifal ran Eagle at the time of Plaintiff's employment, he reported to

---

[3]Defendants assert that Parsifal was the COO while Plaintiff was an employee, but Plaintiff disputes that the evidence supports the fact as stated because Parsifal testified that, though he is now the COO of Eagle and currently runs its day-to-day operations, he is unsure of how long he has been in that position. Pl. Resp. SMF at ¶ 10. Parsifal did testify that he was COO for, "if I can remember correctly, three years or so." Parsifal Dep. at 6.

Empire's co-owner, William Schmeelk, when performing work for that company.[4] Def. SMF at ¶ 13; Parsifal Dep. at 72. In addition to Parsifal, Eagle has at least five other management-level employees that work only for Eagle.[5] Def. SMF at ¶ 14; Krumper Dec. at ¶ 8.

Generally speaking, Makrides manages Tellworks's business activities and Krumper handles day-to-day operations. Def. SMF at ¶ 20. In particular, Makrides provides accounting services to Tellworks and is paid a consulting fee as an independent contractor, working about ten hours per week on behalf of Tellworks. Pl. Resp. SMF at ¶ 20. Tellworks employs a number of employee-facing management personnel who do not work for either Eagle or Empire. Def. SMF at ¶ 21. For example, Tellworks employs a senior vice president of operations, a senior vice

---

[4]Again, Plaintiff disputes that the evidence supports this fact because the record does not indicate that Parsifal ran Eagle at the time of Plaintiff's employment. Pl. Resp. SMF at ¶ 13. It does, however, support the fact that Parsifal now, when working for Empire, reports to Schmeelk.

[5]Plaintiff objects to the Krumper declaration in its entirety because it "is conclusory without reference to the timeframe to which the statements refer or to which specific employees the statement are referencing." Pl. Resp. SMF at ¶ 14. Based on the tense used by Krumper, it appears to be referencing the current set-up, rather than the management structure in 2013 and 2014. As discussed more fully below, the Court disagrees with Plaintiff's contention that the Krumper declaration is inadmissible.

president of IT, multiple regional managers, and many assistant regional managers, all of whom work only for Tellworks.[6] Def. SMF at ¶ 21.

Most of Defendants' personnel work only for one of the three companies. Def. SMF at ¶ 6. However, Plaintiff and seven other employees, who worked in the corporate offices, were employed by and worked simultaneously for all three Defendants. Pl. Resp. SMF at ¶ 1. The other employees were Leah Kendrick, Linda Ebo, Melissa Draper, Phillip Lefkoff, Tommy Hughes, Jared Krumper, and Renee Underwood. Pl. Resp. SMF at ¶ 1. Kendrick testified that she did "not really" do different work for each Defendant. Kendrick Dep. at 11. These employees, and Plaintiff, were paid three paychecks each pay period, one from each of the Defendants. Pl. SMF at ¶ 17; Pl. Resp. SMF at ¶ 1.

Each Defendant has a number of their own management and support staff. Def. SMF at ¶ 7. During Plaintiff's tenure, Defendants shared eight employees. Pl. Resp. SMF at ¶ 7. In total, Empire employed 17-20 employees and Tellworks employed approximately 25 individuals. Pl. Resp. SMF at ¶ 7. Those employees who work for

---

[6]Plaintiff objects to Makrides's declaration as "a sham" because it does not provide employee names or the time period during which they were employed. Pl. Resp. SMF at ¶ 21. The Court takes up this argument below. According to Tellworks's Georgia Quarterly Tax Reports for 2013, Tellworks had 20 employees during the first two quarters, 38 during the third quarter, and 42 employees during the fourth quarter of 2013. *Id.*; Pl. Exs. 58, 59.

more than one of the companies generally work in operations and always in positions where full-time staff for any particular company is not necessary.[7] Def. SMF at ¶ 8. Defendants assert that all employees who work for any of the Defendants are paid by each of their respective employers on the basis of the value they provide and the amount of time they dedicate to work for each employer. Def. SMF at ¶ 9. Plaintiff disputes this characterization because there was no division of time between which company she worked for at a given moment, and no one monitored how much time the shared employees were spending on each company. Pl. Resp. SMF at ¶ 9; Makrides Dep. at 32-33. In particular, Plaintiff testified that she was "always doing something for all three companies at the same time." Pl. Dep. at 60-61. In addition, Underwood worked forty hours per week for each of the three Defendants, doing work for all three during those forty hours, and Krumper testified that Underwood was not

---

[7]Plaintiff disputes the contention that those employees who worked for more than one of the companies were not full-time staff. Pl. Resp. SMF at ¶ 8. In particular, Plaintiff maintains that she was a full-time salaried employee because she had health insurance and only full-time salaried employees had health insurance. Pl. Resp. SMF at ¶ 8. In addition, Plaintiff points to Underwood's testimony that in a given week she worked forty hours for each Defendant, all at the same time. Pl. Resp. SMF at ¶ 8; Underwood Dep. at 17-18. As with the question of whether Defendants are legally unrelated or operate independent of one another, the question of whether Plaintiff was a full-time employee goes to the heart of her claim(s) and is addressed in the discussion section.

told how to do her job or how much time to spend on each company. Pl. Resp. SMF at ¶ 9; Krumper Dep. at 20-21.

"[F]ull-time salaried employees," whether they worked for Tellworks, Empire, or Eagle, had health insurance through Tellworks, and neither Eagle nor Empire had any separate health insurance plan for employees. Pl. SMF at ¶¶ 19-20; Pl. Resp. SMF at ¶ 1; Underwood Dep. at 34-35. Instead, Eagle and Empire reimbursed Tellworks for its employees' health insurance, including reimbursing part of the premiums for the employees who worked for all three companies. Pl. SMF at ¶ 21; Pl. Resp. SMF at ¶ 1. Plaintiff was eligible for health insurance benefits, and therefore contends she was considered a full-time employee. Pl. Resp. SMF at ¶ 1; Underwood Dep. at 34-35; Makrides Dep. at 62. In addition, Plaintiff had short-term disability insurance benefits in the name of Tellworks, but it covered her employment with all three Defendants. Pl. SMF at ¶ 18; Pl. Resp. SMF at ¶ 1.

Defendants assert that Plaintiff was separately although simultaneously employed by Eagle, Tellworks, and Empire. Def. SMF at ¶ 22. Again, this is an issue in dispute, and the Court addresses the argument in the discussion section. Plaintiff, when she had her six month review on May 1, 2013– before she became pregnant– was given a "$5,000 increase," with no indication of which company was increasing her salary. Pl. Add. SMF at ¶ 34; Pl. Resp. SMF at ¶ 22; Pl. Exs. 24, 26. In addition,

Plaintiff's salary was listed as $40,000, not as one-third of that for each Defendant. Pl. Resp. SMF at ¶ 22; Pl. Ex. 26. Similarly, when Plaintiff was hired, she was listed as being paid $40,000, with a notation of the payroll code for each of the three Defendants. Pl. Resp. SMF at ¶ 22; Pl. Ex. 24; Underwood Dep. at 116-18. Moreover, only Tellworks submitted a Georgia New Hire Reporting form for Plaintiff. Pl. Resp. SMF at ¶ 22; Pl. Ex. 45. Kingsley estimates that she split her work-time fairly evenly between Eagle, Tellworks, and Empire, although she did not keep track of her hours for each Defendant. Def. SMF at ¶ 23; Pl. Resp. SMF at ¶ 23. She received three separate paychecks; one from each of the Defendants. Def. SMF at ¶ 23; Pl. Resp. SMF at ¶ 23.

Kingsley reported to and worked with varying overlapping individuals depending on which company she was working for at a given time. Def. SMF at ¶ 24. However, Plaintiff's immediate supervisor, regardless of which company she was working on behalf of, was Lefkoff, then his replacement, Hughes. Pl. SMF at ¶ 10; Pl. Resp. SMF at ¶ 24. Moreover, Plaintiff was supervised by CEO Krumper regardless of which Defendant she was performing duties on behalf of. Pl. SMF at ¶ 10; Pl. Resp. SMF at ¶ 24. Plaintiff was also supervised by Makrides when performing duties for Eagle and Tellworks. Pl. SMF at ¶ 10; Pl. Resp. SMF at ¶ 24; Def. Resp. SMF at ¶ 10;

11

Makrides Dec. at ¶ 12. Plaintiff was supervised by Schmeelk, among others, when performing duties for Empire. Pl. Resp. SMF at ¶ 24.

Kingsley had different job duties with respect to each of the different companies. Def. SMF at ¶ 25; Def. Resp. SMF at ¶ 9. However, Plaintiff testified that her duties for all three Defendants were similar. Pl. SMF at ¶ 9; Pl. Resp. SMF at ¶ 22; Pl. Dep. at 61; Pl. Ex. 62 at ¶ 4; Def. Ex. 2. For all three companies, Plaintiff was an Accounts Manager. Pl. Resp. SMF at ¶ 25. Her duties involved general accounting, including invoicing accounts, maintaining books and preparing financial reports; reconciling accounts and credit card statements; preparing accounts payable and receivables, including collections; tracking and emailing disbursements processing expense reports; and invoicing intercompany charges at month's end. Pl. Resp. SMF at ¶ 25.

Kingsley was subject to the same HR policies for all three companies, because the companies employed the same HR professional, Renee Underwood, who, like Kingsley, split her time roughly evenly working for Eagle, Tellworks, and Empire. Def. SMF at ¶ 26; Pl. Resp. SMF at ¶ 1; Pl. SMF at ¶ 13. Defendants had no sexual harassment policies, equal opportunity policies, or any policy regarding what employees are to do if they feel they are being treated unfairly. Pl. Resp. SMF at ¶ 26. In fact, Makrides, Schmeelk, and Krumper were all unable to identify any written

personnel policies. Pl. Resp. SMF at ¶ 26; Krumper Dep. at 23-25; Schmeelk Dep. at 29; Makrides Dep. at 41-42. In fact, Defendants had no employee handbook, and policies were conveyed to employees orally when they were hired, or perhaps at staff meetings. Pl. SMF at ¶ 22.

Underwood was responsible for Human Resources functions, payroll, data entry, handling emails and phone calls, and general office duties. Pl. SMF at ¶ 14; Pl. Resp. SMF at ¶ 1. Underwood worked forty hours per week in total, for all three Defendants, and no one Defendant required more time than any other. Pl. SMF at ¶ 16; Pl. Resp. SMF at ¶ 1. In fact, Underwood testified that she worked forty hours per week for each company. Pl. Resp. SMF at ¶1; Underwood Dep. at 17-18. Underwood was supervised by Krumper when performing duties for Eagle, by Schmeelk when performing duties for Empire, and by Krumper and Makrides when performing duties for Tellworks. Pl. SMF at ¶ 15.

Because Kingsley worked in accounting and had responsibilities related to each company's finances, she often reported directly to ownership, in addition to lower-level management. Def. SMF at ¶ 27. For Tellworks and Eagle, Kingsley reported, at various times, to Makrides, Krumper, and Phillip Lefkoff. Def. SMF at ¶ 28. From about 2009 until 2013, Lefkoff worked as a controller for all three Defendants and was responsible for financial statements and accounting. Def. SMF

13

at ¶ 29; Pl. Resp. SMF at ¶ 1; Krumper Dec. at ¶ 11. Lefkoff supervised Plaintiff regardless of which of the three Defendants she was working on behalf of. Pl. Resp. SMF at ¶ 1. At the time of Plaintiff's termination, Tom Hughes had replaced Lefkoff as controller for the Defendants, and as her supervisor. Def. SMF at ¶ 28; Pl. Resp. SMF at ¶ 1. For Empire, Kingsley reported to Schmeelk, but also to Krumper and Lefkoff. Def. SMF at ¶ 30. Kingsley did not report to Makrides with respect to her work for Empire except when he was providing financial services for Empire and needed Plaintiff to provide him financial reports. Def. SMF at ¶ 31; Pl. Resp. SMF at ¶ 31.

Because Plaintiff split her work-time evenly between the Defendants, she did not work more than 1250 hours in the year for any one of the three companies individually. Def. SMF at ¶ 32; Def. Resp. SMF at ¶ 31. Defendants admit that, in total, Plaintiff worked the requisite number of hours per year for purposes of the FMLA, that is, she worked more than 1250 hours during the year prior to her maternity leave for Defendants as a whole. Pl. SMF at ¶ 31; Def. Resp. SMF at ¶ 31; Pl. Resp. SMF at ¶ 32. Krumper's deposition testimony made clear that he did not know which companies had employed Plaintiff or what her duties were, aside from the fact that she was in the accounting department. Pl. Resp. SMF at ¶ 32.

In April 2013, Plaintiff learned that she was pregnant. Pl. SMF at ¶ 37. She told Defendants she was pregnant in May 2013. Pl. SMF at ¶ 38. Plaintiff requested maternity leave in 2013. Pl. SMF at ¶ 23. As time passed, Plaintiff discussed taking maternity leave with Defendants' Human Resources Manager, Underwood. Pl. Add. SMF at ¶ 44. Underwood told Plaintiff she was eligible for twelve weeks of FMLA leave. Pl. Add. SMF at ¶ 45.

According to Makrides, Plaintiff had done her job to the highest level and was very dependable and accurate. Pl. Add. SMF at ¶ 35. Makrides told Plaintiff he was very pleased with her performance and that she was a good employee. Pl. Add. SMF at ¶ 35; Makrides Dep. at 110. At the time Plaintiff was hired, Makrides believed she was qualified for her job. Pl. Add. SMF at ¶ 36; Makrides Dep. at 106-107.

After Plaintiff told Defendants she was pregnant, things changed. Pl. Add. SMF at ¶ 39; Pl. Dep. at 20; Kendrick Dep. at 40-41. For example, shortly after Plaintiff disclosed her pregnancy, Kendrick went to Krumper's office, and when she told him she needed to talk to him about something, he said "You better not be fucking pregnant too." Pl. Add. SMF at ¶ 40; Kendrick Dep. at 28, 31. Similarly, Makrides told Kendrick that Plaintiff had made a big mistake and never should have gotten pregnant. Pl. Add. SMF at ¶ 41; Kendrick Dep. at 28. Makrides also repeatedly asked Plaintiff to delay her maternity leave. Pl. Add. SMF at ¶ 43.

15

Plaintiff took maternity leave on or about December 2, 2013. Def. SMF at ¶ 38. Plaintiff requested leave through January 31, 2014. *Id.* at ¶ 39. However, Plaintiff was supposed to end her leave and return to work on Monday, January 27, 2014. Pl. Add. SMF at ¶ 50. Underwood told Plaintiff that because she was a salaried employee, she would receive full pay during her maternity leave. Pl. SMF at ¶ 24. However, Underwood's representation was erroneous, and she corrected it and apologized on December 4, 2013– after Plaintiff was on maternity leave. Pl. SMF at ¶ 27; Def. Resp. SMF at ¶¶ 24, 27; Pl. Dep. at 62-63; Pl. Add. SMF at ¶ 48. Plaintiff was then told she could apply for short-term disability, and during a portion of Plaintiff's leave, she received payment via short-term disability leave. Pl. Add. SMF at ¶ 48; Def. SMF at ¶ 40. Plaintiff asked if she could also be paid her one week of accrued leave, but the request was denied. Pl. Add. SMF at ¶ 49.

Plaintiff was asked to continue to perform work duties while she was on maternity leave, and she agreed to do so. Pl. SMF at ¶ 25; Pl. Dep. at 22. Plaintiff submitted a list of all her job duties for each of the three companies and marked which duties she thought she could perform from home. Pl. SMF at ¶ 26. The only work Plaintiff performed for Defendants during her leave was to book travel on a couple of occasions. Pl. SMF at ¶ 28. Defendants engaged a temporary worker, Melissa Draper,

16

to perform Plaintiff's duties during the pendency of Plaintiff's leave.[8] Pl. SMF at ¶ 47; Def. SMF at ¶ 41. At the time of her initial engagement, Defendants expected that Draper would work for them until Plaintiff returned from leave, after which time Draper would no longer work for Defendants. Def. SMF at ¶ 42. However, Plaintiff was asked before she went on leave what she thought of Draper staying on permanently. Pl. Resp. SMF at ¶ 42; Pl. Dep. at 74.

While Plaintiff was on leave, Makrides and Krumper claim that they learned that Plaintiff's bad attitude had negatively impacted their workforces prior to taking leave. Def. SMF at ¶ 43; Makrides Dep. at 19, 21-22, 58-59. Makrides testified that all of the information came to him the Friday before Plaintiff was to return to work on Monday, or thereabouts, not throughout Plaintiff's leave and not in all the time Plaintiff worked for Defendants prior to her pregnancy. Pl. Resp. SMF at ¶ 43; Makrides Dep. at 21-22. Makrides testified that he spoke with Parsifal, Schmeelk, and Hughes regarding Plaintiff's negative attitude. Pl. Resp. SMF at ¶ 43; Makrides Dep. at 19, 21. According to Makrides, Parsifal told him that he did not want Plaintiff brought back from leave because of her bad attitude and poor communication skills. Parsifal testified that "there was issues with her attitude" and he remembered "being

---

[8]Plaintiff disputes that Draper performed all of Plaintiff's duties. In particular, Plaintiff contends that she completed many tasks that would come up during her absence in order to assist Draper before she took leave. Pl. Resp. SMF at ¶ 41.

extremely frustrated with the interactions that were taking place with her." Def. SMF at ¶ 46; Def. Resp. Add. SMF at ¶ 66; Makrides Dep. at 29; Parsifal Dep. at 23. Parsifal testified, however, that he vaguely remembered Makrides asking him about various employees, including Plaintiff, on different occasions– including before Plaintiff went on maternity leave. Pl. Resp. SMF at ¶ 43; Parsifal Dep. at 22, 24-25. In fact, Parsifal did not remember talking to Makrides about Plaintiff while she was on maternity leave at all, though he thinks he might have spoken with Makrides both before and during Plaintiff's leave. *Id.*; Pl. Add. SMF at ¶ 65; Def. Resp. Add. SMF at ¶¶ 64-65. Nor does Parsifal remember speaking with Makrides about whether Plaintiff should come back from leave. Pl. Resp. SMF at ¶ 43; Parsifal Dep. at 27.

Schmeelk testified that Makrides asked his opinion of Draper, and Schmeelk told Makrides that he had no issues and enjoyed working with her. Pl. Resp. SMF at ¶ 43; Pl. Add. SMF at ¶¶ 67-68; Schmeelk Dep. at 40-42. Schmeelk did not recall Makrides saying that they were considering or trying to decide whether to terminate Plaintiff nor did he remember having a conversation with Makrides about this in the days before Plaintiff was to return. Pl. Resp. SMF at ¶ 43; Pl. Add. SMF at ¶ 69; Schmeelk Dep. at 40-42. In fact, though Makrides testified that both Parsifal and Schmeelk were "adamant" that they did not want to "re-experience" working with Plaintiff, Makrides Dep. at 28-29, Schmeelk testified otherwise– that he was not

18

adamant that Plaintiff be terminated. Pl. Resp. SMF at ¶ 43; Schmeelk Dep. at 40-42. Schmeelk also testified that he had no recollection of speaking with Krumper about Plaintiff's performance in the week or so before Plaintiff was terminated. Pl. Resp. SMF at ¶ 43; Schmeelk Dep. at 32-33. The conversation that Schmeelk recalled having with Krumper took place before Plaintiff went on leave. *Id.* Schmeelk further testified that he had spoken to Krumper once or twice about Plaintiff's general attitude while she was "actively in the office" and did not recall any conversations with Krumper about Plaintiff while she was on leave. Pl. Resp. SMF at ¶ 51; Schmeelk Dep. at 21-34.

Since this deposition testimony, Schmeelk has submitted a declaration that states "While Kingsley was on leave, [he] reported to Krumper and Christo Makrides that Kingsley had a bad attitude and an often unprofessional demeanor." Pl. Resp. SMF at ¶ 43; Schmeelk Dec. [42-5] at ¶ 19. In addition, though Schmeelk testified at his deposition that he did not know Plaintiff had been terminated until several weeks after the fact, and did not recall if he had made a recommendation, in his declaration, he states that he recommended Plaintiff be terminated and that the sole basis for his recommendation was his realization, during Plaintiff's leave, that working with her was so unpleasant. Pl. Resp. SMF at ¶ 43; Schmeelk Dep. at 40-41; Schmeelk Dec. at ¶ 20.

Makrides testified that he went to Hughes after Krumper told him that some people did not believe it was appropriate for Plaintiff to return from leave. Pl. Resp. SMF at ¶ 43; Makrides Dep. at 22-23. Krumper identified Schmeelk, Parsifal, Nettles, and "the accounting girl from up in Nashville" as the employees who had come to him during Plaintiff's leave.[9] Pl. Resp. SMF at ¶ 43; Krumper Dep. at 132-33. According to Makrides, Hughes complained that Plaintiff was gossiping, snooping around the office, and going behind his back to ownership. Def. SMF at ¶ 44; Pl. Resp. SMF at ¶ 43; Pl. Add. SMF at ¶ 60; Makrides Dep. at 23-24. Makrides acknowledged that he knew that Plaintiff's "snooping around" was done on behalf of Krumper, however, who had asked Plaintiff to be his eyes and ears while he was out of the office and that Hughes probably did not like that. Pl. Resp. SMF at ¶ 43; Makrides Dep. at 23-24; Krumper Dep. at 81-82, 216-17. Makrides also testified that Hughes did not think Plaintiff was "a proper fit for the office" and that Plaintiff's actions on behalf of Krumper while he was out of the office detracted from her ability to complete her job. Def. Resp. Add. SMF at ¶ 60.

---

[9]Krumper, however, later testified that the "girl in Tennessee" did not actually complain to him about Plaintiff. Krumper Dep. at 144.

Patrick Graffius, who works in operations for Eagle, told Makrides that he recognized discomfort between various office staff and Plaintiff.[10] Def. SMF at ¶ 47; Graffius Dep. at 22-23. Graffius also told Krumper and Makrides that Plaintiff "was difficult to work with." Def. SMF at ¶ 48; Graffius Dep. at 25.

Krumper testified that he thinks Nettles spoke to him while Plaintiff was on leave and "potentially" raised other issues, besides those reflected in the aforementioned emails. Pl. Resp. SMF at ¶ 51; Krumper Dep. at 132-33, 139-140.[11]

---

[10]Plaintiff objects to this testimony as hearsay, but the Court overrules the objection to the extent that Graffius's testimony is not being offered for the truth of the matter asserted. For example, Defendant may intend to use the testimony to indicate what Makrides believed to be true at the time he fired Plaintiff. Plaintiff also objects to Graffius's testimony as immaterial because neither Krumper nor Makrides ever testified that anything Graffius told them was a factor in Plaintiff's termination. As to that, the Court overrules the objection. While inconsistencies in Makrides's explanation of the sources of his information about Plaintiff may contribute to issues of disputed facts, it is no basis to exclude otherwise admissible evidence as irrelevant.

[11]Plaintiff explains her relationship with Nettles, with citations to Plaintiff's Exhibit 62. However, Defendants object to Plaintiff's Exhibit 62 because it is not signed and sworn to under penalty of perjury. According to 28 U.S.C. § 1746, a declaration, if unsworn, must be "subscribed by [the declarant] as true under penalty of perjury." Here, Plaintiff's Exhibit 62 is neither signed nor declared under penalty of perjury. Accordingly, the Defendants' objection as to Plaintiff's Exhibit 62 is sustained, and the Court will not consider this portion of Plaintiff's Additional Statement of Material Facts. Plaintiff cites Plaintiff's Exhibit 62 for other propositions, but the Court does not include them because of the inadmissibility of the exhibit.

Makrides says that he believed that Draper's attitude and demeanor were viewed by her co-workers as more pleasant than Plaintiff's. Def. SMF at ¶ 49; Makrides Dec. at ¶ 22. Moreover, according to Makrides, he believed that Plaintiff's co-workers would not want to go back to working with her. Def. SMF at ¶ 50; Makrides Dep. at 29. After hearing the employee complaints, Makrides claims that he understood that Plaintiff was disliked by many in the office. Def. SMF at ¶ 50; Makrides Dec. at ¶ 22. None of Defendants' employees, including Krumper and Makrides, however, complained to Underwood, the HR Manager, about Plaintiff not getting along with anyone, being rude, or being unwilling to take on responsibilities or help out. Pl. Add. SMF at ¶ 64.

Defendants contend that as a result of the new information uncovered suddenly, just a day or so before Plaintiff's leave was to expire, Krumper and Makrides decided to terminate Plaintiff's employment. Pl. SMF at ¶ 32; Pl. Add. SMF at ¶ 54; Def. SMF at ¶ 51; Makrides Dec. at ¶ 23; Krumper Dec. at ¶ 22; Makrides Dep. at 58. Plaintiff's termination was effective as of February 1, 2014. Def. SMF at ¶ 52; Pl. Dep. at 65-66, Ex. 16; Schmeelk Dec. at ¶ 21; Krumper Dec. at ¶ 23; Makrides Dec. at ¶ 24.

On Friday, January 24, 2017, Plaintiff received a call from Krumper, and Krumper told her she was being terminated. Pl. Add. SMF at ¶ 51. During the phone call, Krumper told Plaintiff that her position was being eliminated because the

companies were restructuring and "going in another direction." Pl. Add. SMF at ¶ 52; Def. Resp. Add. SMF at ¶ 52. However, there was no restructuring, and Defendants hired Draper on a permanent basis to replace Plaintiff. Pl. Add. SMF at ¶ 53.

Plaintiff's separation notice was filled out by Underwood, but Krumper told her what to put in it. Pl. Add. SMF at ¶ 55; Underwood Dep. at 79-80; Pl. Ex. 12. However, Makrides testified that Underwood made a mistake when she put "restructuring" on the termination notice. Def. Resp. Add. SMF at ¶ 55; Makrides Dep. at 39.

In their first response to Plaintiff's Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination, Tellworks informed the EEOC that it had hired a temporary employee to perform Plaintiff's duties, and because the temporary employee "managed her workload more efficiently, and had a stronger skill set (including better communication skills)" than Plaintiff, Tellworks "ultimately decided to retain the temporary employee on a permanent basis." Pl. Add. SMF at ¶ 57; Def. Resp. Add. SMF at ¶ 57; Pl. Ex. 23. Defendants submitted a follow-up letter to the EEOC on December 19, 2014, which stated "Ms. Draper also had better interpersonal skills than Charging Party. Specifically, Ms. Draper had a positive attitude and got along well with her co-workers, while Charging Party was often rude

23

to her coworkers and was unwilling to assist others." Def. Resp. Add. SMF at ¶ 57.

The supplemental letter also stated:

> [T]he temporary employee hired to perform the duties of [Kingsley],
> Melissa Draper, managed her workload more efficiently than Kingsley.
> In particular, [Draper] prioritized her workload and understood the
> urgency of certain assignments over other, while [Kingsley] spent a lot
> of the workday on non-work distractions that precluded her from
> finishing daily tasks in a timely manner. Moreover, Ms. Draper took on
> additional tasks, such as analyzing the Company's financial record and
> researching and suggesting more cost-effective vendors.

Pl. Add. SMF at ¶ 58. Schmeelk also testified that Draper was "doing a fantastic job,

going above and beyond . . . and it was just a better experience." Def. Resp. Add. SMF

at ¶ 57; Schmeelk Dep. at 42-43.

Defendants now assert that Plaintiff was terminated in the midst of her

maternity leave because of her attitude, poor relations with co-workers, and hostile

communications with co-workers. Plaintiff testified that she was sarcastic on four

separate occasions and that she and Krumper had a sarcastic relationship when

sending text messages. Def. SMF at ¶ 33; Pl. Resp. SMF at ¶ 33; Plaintiff Dep. at 35,

41, 51, 55; Ex. 7. Defendant cites two text messages sent by Plaintiff in support of the

fact that Plaintiff "routinely gossiped about coworkers." Def. SMF at ¶ 34.

Specifically, Plaintiff sent a text message to Krumper stating that her supervisor,

Hughes, had left the office to pick up his daughter and did not return, Pl. Dep. at 43;

24

Ex. 10, and she sent a text message to her supervisor, Lefkoff, that "Everyone thinks Amanda is drunk this morning. She is crazy." Pl. Dep. at 45. Krumper, however, had asked Plaintiff to be his "eyes and ears" and to make reports of what was going on in the office because he traveled a lot. Pl. Resp. SMF at ¶ 34; Krumper Dep. at 81-82; 216-17. In fact, his response to Plaintiff's text message regarding Hughes was "Ok thank you for the update," to which Plaintiff responded "Eyes and ears right?" and Krumper said "Yes thanks." Pl. Resp. SMF at ¶ 34; Def. Ex. 8.

With regard to Plaintiff's text message to Lefkoff, Plaintiff testified that she thought her boss would want to know if an employee came to work drunk, and no one had ever told her not to report to her supervisors if an employee is drunk at work. Pl. Resp. SMF at ¶ 34; Pl. Dep. at 47; Lefkoff Dep. at 15. The employee referred to in that text message, Amanda Roach, was eventually terminated for not performing her job. Pl. Resp. SMF at ¶ 34. Krumper had to ask Roach to leave work because of her behavior at times, and Underwood had observed Roach at times where she believed Roach was under the influence of alcohol. Pl. Resp. SMF at ¶ 34. In fact, Underwood reported this to both Krumper and Makrides. Pl. Resp. SMF at ¶ 34; Krumper Dep. at 31-32; Underwood Dep. at 83-85.

In addition, Defendants cite testimony from Parsifal that Plaintiff "tended to gossip with a lot of people, and that would continue to poison the environment, as

25

well." Def. SMF at ¶ 34; Parsifal Dep. at 19-20. Parsifal, in his testimony, was referring specifically to a co-worker in Tennessee, Jerry Nettles, and he could not give specific information about Plaintiff's gossiping. Pl. Resp. SMF at ¶ 34. Instead, Parsifal testified that "it seemed like that's what I was hearing throughout the office." Parsifal Dep. at 20. Parsifal also testified that he would have brought this to Krumper's and Makrides's attention at the time it occurred. Parsifal Dep. at 21-22.

Plaintiff sent Lefkoff a text message asking whether he was coming back to work on March 29, 2013.[12] Pl. Resp. SMF at ¶ 35; Pl. Dep. at 33; Def. Ex. 3. Plaintiff further testified that she did not remember this text message, but that she probably needed help with something. Pl. Resp. SMF at ¶ 35; Pl. Dep. at 33. Moreover, Lefkoff testified that he felt the texts Plaintiff sent him were appropriate. Pl. Resp. SMF at ¶ 35; Lefkoff Dep. at 47.

Plaintiff sent her co-worker, Nettles, an email in May 2013 asking him about $890 that was missing from a deposit. Pl. Resp. SMF at ¶ 36; Pl. Dep. at 35; Def. Ex. 4. Nettles responded with the reason for the discrepancy, and Plaintiff wrote back "Things that are good to know BEFORE the event, Jerry." Def. SMF at ¶ 36; Pl. Dep.

---

[12]Defendants state "Kingsley pestered coworkers about their whereabouts when they were out of the office," citing only Plaintiff's deposition testimony. This is an inaccurate characterization of Plaintiff's testimony, which refers to only one incident in which she asked her supervisor, Lefkoff, when he would be returning to work.

at 35; Ex. 4. Defendants characterize this email as "combative and argumentative." Def. SMF at ¶ 36. Krumper was copied on this email and responded to it. Pl. Resp. SMF at ¶ 36; Def. Ex. 4.

Plaintiff sent another email to a co-worker, Cheryl De Almeida, that Defendants cite as "combative and argumentative." Def. SMF at ¶ 36; Pl. Resp. SMF at ¶ 36; Pl. Dep. at 47-48; Def. Ex. 10. In that email, Plaintiff wrote "For the hundredth time you are spelling my name wrong. It is E-L not A-E-L." *Id.* Plaintiff testified that De Almeida misspelled her name often, and Plaintiff felt this was disrespectful. Pl. Resp. SMF at ¶ 36; Pl. Dep. at 48. Finally, Defendants cite an email exchange from November 2013 between Plaintiff and Krumper as further evidence that she was combative and argumentative. Def. SMF at ¶ 36. Plaintiff refused to respond to an email from Krumper in which her name was misspelled. Def. SMF at ¶ 36; Pl. Dep. at 54; Def. Ex. 14.

Defendants also state that Plaintiff "sent sarcastic or otherwise inappropriate text messages and emails to supervisors." Def. SMF at ¶ 37. In particular, Krumper sent Plaintiff a text message in July 2013 that asked her where she was, and she responded "At a rave getting wasted." Def. SMF at ¶ 37; Pl. Resp. SMF at ¶ 37; Pl. Dep. at 49. In October 2013, Plaintiff sent Krumper a text message asking if he was really going to fire her if she listened to Pandora on the computer. Def. SMF at ¶ 37;

27

Pl. Resp. SMF at ¶ 37. Plaintiff testified that Krumper had told employees not to stream music on work computers and asked because she really enjoyed listing to music at work. Pl. Resp. SMF at ¶ 37; Pl. Dep. at 49-50. Plaintiff had an email exchange with a co-worker in October 2013 wherein Plaintiff requested that the co-worker send her contracts prior to an event taking place and send along the email address for the contact and the form of payment to settlement charges as soon as possible. Pl. Resp. SMF at ¶ 37; Pl. Dep. Ex. 12. The co-worker responded by writing "Feel free to not email me anymore" and gave no indication that the requested information would be sent. Pl. Resp. SMF at ¶ 37. Plaintiff then forwarded the email to Krumper, saying she needed the co-worker to do his job and provide the information requested. Pl. Resp. SMF at ¶ 37. This co-worker did not comply with the procedures and had a history of not turning in full, complete paperwork. Pl. Resp. SMF at ¶ 37; Pl. Dep. at 52.

There were three employees who were not pregnant, took leave, and were not terminated: Defendants' HR Manager Underwood, Eagle's Regional Director of Operations Graffius, and Defendants' Receptionist Ebo. Pl. Add. SMF at ¶ 81. Underwood took three months' leave in 2012 following hip replacement surgery but was allowed to return to work following her leave. Pl. Add. SMF at ¶ 82. Underwood was allowed to work from home and was paid her full salary for the duration of her

leave. Pl. Add. SMF at ¶ 83. Graffius took leave following the birth of a child, was allowed to return to work without penalty, and was paid during his leave and could work remotely. Pl. Add. SMF at ¶ 84. Ebo was allowed to take leave for two to four weeks due to breast cancer surgery, was paid her regular salary, and did not have to use any of her vacation or sick time. Pl. Add. SMF at ¶ 85.

## II.   DISCUSSION

### A.   *Plaintiff's Evidentiary Objections*

On March 6, 2017 Plaintiff filed her "Notice of Objection to Evidence" [59] ("Objection"). Plaintiff states that she objects to the Court's consideration of the declarations of Jared Krumper, Christo Makrides, and William Schmeelk filed by Defendants in connection with their Motion for Summary Judgment [42], on the ground that they "contain various statements that directly conflict with Defendants' prior admissions and the respective declarant's sworn deposition testimony." Objection at 2; *see* Krumper Dec. [42-3]; Makrides Dec. [42-4]; Schmeelk Dec. [42-5].

According to Plaintiff, Defendants have set forth three virtually identical declarations that contain legal conclusions that should be disregarded and operate as sham affidavits because they contradict previous clear answers to unambiguous questions. First, Plaintiff objects to the statements, set forth in all three declarations,

29

that Defendants are "legally unrelated." *See* Krumper Dec. at ¶ 6; Makrides Dec. at ¶ 6; Schmeelk Dec. at ¶ 5.

Plaintiff argues that paragraphs 6 of Krumper's and Makrides's declarations, and paragraph 5 of Schmeelk's declaration, should be "disregarded" because they are "impermissible legal conclusions." Objection at 4. Plaintiff argues that because she has argued, and come to the legal conclusion, in her Motion for Partial Summary Judgment that the Defendants are an integrated enterprise or joint employers, that means the declarants' statements otherwise are "mere conclusions" that "have no probative value." Objection at 4 (quoting *Benton-Volvo-Metairie, Inc. v. Volvo Southwest, Inc.*, 479 F.2d 135, 139 (5th Cir. 1973)).

Defendants argue that Plaintiff has applied the wrong standard because the declarations set forth admissible facts based upon the personal knowledge of the declarants. In particular, Rule 56(c)(4) of the Federal Rules of Civil Procedure requires that a declaration be based "upon personal knowledge, set out facts that would be admissible in evidence, and show . . . [that the] declarant is competent to testify on the matters stated." In applying this standard, the Eleventh Circuit considers whether a declaration presents merely "conclusory allegations without specific supporting facts" or, in the alternative, "presents supporting facts." *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). When a declaration contains

specific facts, it "rise[s] above the level of a bare assertion." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

In this case, Schmeelk's declaration includes facts to support the statement that "Empire does not have any legal relationship to either Eagle or Tellworks," Schmeelk Dec. at ¶ 5, including the fact that "the only material financial relationship between the three companies . . . relates to shared office space." Schmeelk Dec. at ¶ 4. In addition, Schmeelk testifies that he co-owns Empire, but has no ownership stake in either Eagle or Tellworks. Schmeelk Dec. at ¶¶ 2, 5. Similarly, Makrides's declaration makes clear that he is a co-owner of Eagle and Tellworks but has no ownership stake in Empire. Makrides Dec. at ¶¶ 2-4. Makrides further states that most personnel for the three companies work for only one of the three. Makrides Dec. at ¶ 7. Finally, with regard to Krumper's declaration, he makes clear that he co-owns Eagle, Tellworks, and Empire, but each one operates independently and they share office space but otherwise lack a material financial relationship. Krumper Dec. at ¶¶ 2-5.

In the end, the Court disregards the legal conclusions expressed in these declarations including that Defendants are "legally unrelated." Whether the Defendants are sufficiently related with respect to their employment of Plaintiff such that the aggregate number of her hours should be considered for purposes of determining eligibility for FMLA protections is a legal question to be determined by

31

the Court and/or a jury pursuant to the Court's instructions of law. Nevertheless, the *facts* relating to the ownership, operations and activities of the various Defendants as attested to in these declarations are not legal conclusions subject to exclusion. Plaintiff's objections to such testimony is overruled.

Plaintiff next argues that paragraph 8 of Makrides's declaration, which states that "Tellworks, for example, employs dozens of employee-facing management personnel (e.g. senior vice president of operations, a senior vice president of IT, multiple regional managers and many different assistant regional managers) who do not perform any work for either Eagle or Empire," is directly contradictory to Makrides's deposition testimony and is therefore a sham that should be disregarded by the Court.

In creating an issue of fact, a party may not rely on an affidavit from an individual that directly contradicts his or her own deposition testimony. An affidavit may be considered a "sham" affidavit "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986); *see also Dotson v. Delta Consol. Indus., Inc.*, 251 F.3d 780, 781 (8th Cir. 2001) ("a party may not create

32

a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition"). A court presented with such an inconsistency in a party's testimony may disregard the later "sham affidavit" in favor of the earlier deposition testimony. *Tippens*, 805 F.2d at 949; *see also Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984); *Anderson v. Radisson Hotel Corp.*, 834 F. Supp. 1364, 1373 (S.D. Ga. 1993).

This "sham affidavit" rule, however, as set forth in this Circuit and elsewhere, operates to nullify only *unexplained* variations in testimony. *See Van T. Junkins & Assoc.*, 736 F.2d at 656 ("a district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony *without giving any valid explanation*.") (emphasis added); *accord S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495-96 (5th Cir. 1996); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). When the witness furnishes a credible explanation for his reversal, courts are properly unwilling to discard the revised testimony as a sham. *See, e.g.*, *Pries v. Honda Motor Co.*, 31 F.3d 543 (7th Cir. 1994) (declining to discard affidavit as sham because plaintiff credibly explained variation in testimony based on later understanding of events); *Waitek v. Dalkon Shield Claimants Trust*, 908 F. Supp. 672 (N.D. Iowa 1995) (finding no sham because

medical expert witness gave reasonable explanation for revised opinion presented in affidavit).

Furthermore, the Eleventh Circuit has cautioned courts that, in reviewing affidavits submitted in connection with a motion for summary judgment, an affidavit may not be simply disregarded as a "sham" because it contains information contradictory to other evidence in the record.

> [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.

*Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (*quoted in Tippens*, 805 F.2d at 954).[13]

Thus, Plaintiff's argument fails because Makrides's declaration is not directly contradictory to his deposition testimony. While Plaintiff was working for Defendants, Tellworks had only 25 employees, but Makrides's declaration quite clearly refers to Tellworks in the present, and it may well be that the number of employees has changed since Plaintiff's employment in 2013. Therefore, the Court overrules Plaintiff's objection to paragraph 8 of Makrides's declaration.

---

[13] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Similarly, Plaintiff argues that paragraph 8 of Krumper's declaration, which is identical to paragraph 8 of Makrides's declaration, should also be disregarded. This argument fails for the same reasons noted above with regard to Makrides's declaration. Moreover, Plaintiff specifically acknowledges that Krumper never previously testified about the number of Tellworks employees, so any noted "contradiction" by Plaintiff, with regard to contradictory evidence from other sources, is an issue of fact for a jury to determine. Accordingly, the Court overrules this portion of Plaintiff's Objection.

Next, Plaintiff contends that paragraphs 13-15 of Krumper's and Makrides's declarations, and paragraphs 12-14 of Schmeelk's declaration, which state that Plaintiff did not work more than 1250 hours for Defendants during any 12-month period, should be disregarded because they are in direct conflict with Defendants' admissions to the contrary. Plaintiff alleges in her Complaint that she worked 1250 hours in the year before her maternity leave, and Defendants' Answer admits that Plaintiff "worked a total of more than 1250 hours during the year prior [sic] maternity leave." Answer [9] at ¶ 29. Plaintiff submits that these are "blatant contradictions" that should not be permitted.[14]

_____

[14]Plaintiff also argues that because Underwood told Plaintiff that she was eligible for 12 weeks of FMLA leave, that somehow necessitates striking the declarations. However, Plaintiff cites no case law as to why that would be. The fact

The Court does not agree with Plaintiff that these are blatant contradictions. To the contrary, it is evident to the Court that Defendants admit that Plaintiff's total hours working for all three of them was more than 1250 hours. What they refute, however, is that she worked that many hours for any one, individual, Defendant in the year prior to her maternity leave. This is a factual question, and it is inappropriate for the Court to disregard the declarations based on what Plaintiff takes to be a contradiction. As the undersigned explains in detail below, the fact of this dispute is one of the reasons that summary judgment cannot be granted to either Plaintiff or Defendants at this stage, and the question of whether Plaintiff worked 1250 hours for all three Defendants is one for a jury to resolve. Accordingly, this portion of Plaintiff's Objection is overruled.

Finally, Plaintiff argues that paragraphs 19-20 of Schmeelk's declaration should be disregarded because of "the various discrepancies between the declarant's deposition testimony and the provided declaration and in light of the evidentiary record to the contrary." Objection at 9. In his deposition, Schmeelk was asked if he ever told Krumper that Plaintiff should be terminated. He said "I don't– I don't think

_____

that the declarations do not "give an explanation for Underwood's statement" does not mean they should be stricken because none of the declarations are from Underwood. Instead, the lack of an explanation and the apparent contradiction only means that there are factual issues here for a jury to resolve.

so. I don't know. Not that I recall." Schmeelk Dep. at 34. Schmeelk was then asked if he suggested that termination would be appropriate, and he said he did not think so. Schmeelk Dep. at 14. Schmeelk further testified that he did not recall talking to Krumper about Plaintiff while she was on leave and that his conversations with Krumper about Plaintiff occurred when she was in the office. Schmeelk Dep. at 33. Schmeelk also testified that he spoke to Makrides about Plaintiff's replacement while Plaintiff was on leave, but that he did not ask Makrides to do anything. Schmeelk Dep. at 35-36. Schmeelk was also asked if he recommended that Plaintiff be terminated, and he responded that he did not recall. Schmeelk Dep. at 40. Finally, Plaintiff points out that Schmeelk testified that he did not know when Plaintiff was terminated and did not find out for a few weeks after it had occurred. Schmeelk Dep. at 41.

In Schmeelk's declaration, he states that while Plaintiff was on leave, he reported to Krumper and Makrides that Plaintiff should not be brought back and that he recommended that Plaintiff be terminated. Plaintiff argues that this is a discrepancy that warrants disregarding Schmeelk's declaration. The Court disagrees. Here, Schmeelk testified at deposition that he *did not recall* whether he had recommended that Plaintiff be terminated– not that he did not recommend her termination. Similarly, Schmeelk testified that he did not recall whether he had spoken with Krumper about Plaintiff while she was on leave– not that it did not happen. As to Plaintiff's other

notations regarding Schmeelk's deposition testimony, while Schmeelk's selective memory may contribute to an issue of fact for a jury to resolve, it is not the sort of direct contradiction that justifies the extreme remedy of exclusion. Thus, Plaintiff's Objection is **OVERRULED**.

      B.    *Summary Judgment Standard*

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 242.

Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

    C.    *The Issue Common to Both Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment: Whether Plaintiff Worked the Requisite Number of Hours for Eligibility for Protection Under the FLSA*

Plaintiff's Motion for Partial Summary Judgment asserts that there is no genuine issue of material fact relating to whether the Defendants were Plaintiff's employer under both Title VII and the FMLA, whether the Defendants are covered by the FMLA, and whether Plaintiff was an eligible employee under the FMLA. First, Plaintiff argues that Defendants are a single, integrated enterprise under both Title VII and the FMLA. Second, and in the alternative, Plaintiff asserts that Defendants at the very least jointly employed Plaintiff and were therefore liable under Title VII and the FMLA. Third, Plaintiff contends that because Defendants are a single employer, or

40

are joint employers, under the FMLA, they are covered employers for purposes of the FMLA. Finally, Plaintiff argues that she was an eligible employee under the FMLA.

In response, Defendants first argue that they are separate, distinct legal entities that at all times operated independently of one another. Thus, they cannot be deemed a single entity for purposes of the FMLA. Second, Defendants argue that Plaintiff fails to show that Defendants are covered employers under the FMLA. Finally, Defendants contend that, because they are not a single entity, Plaintiff cannot show she was an eligible employee for purposes of the FMLA. Defendants thus oppose Plaintiffs' request for partial summary judgment on these issues, and (among other grounds) cross-moves for summary judgment in their favor on the FMLA claims, on the ground that Plaintiff did not work the requisite number of hours for any individual Defendant to trigger eligibility under the FMLA.

The Court finds that it is most efficient to discuss this issue as it relates to both motions together.

To be eligible for FMLA protection, an employee must have been employed (1) for at least 12 months by the employer with respect to whom leave is requested and (2) for at least 1250 hours of service with the employer during the previous 12-month period. 29 U.S.C. § 2611(2)(A). In addition, the employer must employ 50 or more employees within 75 miles of the employee's worksite. *Id.* at § 2611(2)(B). To be

41

eligible under Title VII, the individual must be an employee, *i.e.*, an "individual[] who receive[s] compensation from an employer." *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1243 (11th Cir. 1998). For purposes of Title VII, an employer is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). Defendants assert, and Plaintiff introduces no evidence to dispute, that she did not work enough hours for each (or any) specific Defendant in the 12-months for purposes of the FMLA. Thus, the primary issue in dispute is whether the employees of all three Defendants can be aggregated under an "integrated employer" theory. For the reasons explained below, the undersigned finds that the facts underlying the aggregation analysis are disputed and therefore not amenable to resolving in either party's favor at summary judgment.

1.   Standards for Integrated and/or Joint Employment Under Title VII and the FMLA

The Eleventh Circuit has identified three circumstances in which it is appropriate to aggregate multiple entities for the purposes of counting employees:

First, where two ostensibly separate entities are " 'highly integrated with respect to ownership and operations,' " we may count them together under Title VII. This is the "single employer" or "integrated enterprise" test. Second, where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat

the entities as "joint employers" and aggregate them. This is the "joint employer" test. Third, where an employer delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer and aggregate the two when counting employees. This is the "agency" test.

*Lyes v. City of Riviera Beach, Fla*, 166 F.3d 1332, 1341 (11th Cir. 1999). Plaintiff here invokes the first two concepts, that is, the integrated enterprise theory and joint employership.

"The single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise . . . ." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997). As the Eleventh Circuit has stated:

The predominant trend in determining whether two businesses should be treated as a single or joint employer [under Title VII] is to apply the standards promulgated by the National Labor Relations Board (NLRB). The NLRB factors include: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. The showing required to warrant a finding of single employer status has been described as 'highly integrated with respect to ownership and operations.'

*McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). The single employer analysis ultimately "concentrate[s] on the degree of control an entity has over the [allegedly liable conduct]" on which the suit is based. *Llampallas v. Mini–Circuits, Lab, Inc*., 163 F.3d 1236, 1244-45 (11th Cir. 1998). Not every factor

43

must be present; nor is any single factor controlling. *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 n.5 (11th Cir. 1999) (en banc).

The FMLA uses similar factors to determine whether entities are a single, integrated enterprise. That is, the test requires courts to assess the level of (1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control. 29 C.F.R. § 825.104(c)(2). Where the integrated employer test is met, "the employees of all entities making up the integrated employer will be counted in determining employer coverage and employee eligibility." *Id.*

In *Virgo*, the Eleventh Circuit summarized the standard for joint employment in Title VII cases:

> The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus the joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

*Virgo*, 30 F.3d at 1359. Thus, the ultimate focus of the joint employer inquiry is the degree of control one company exercises over the employees of another company. *Id.* at 1359-60; *see also Lyes*, 166 F.3d at 1341; *NLRB v. Browning-Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982).

44

Under the FMLA, joint employers may be separate and distinct entities with separate owners, managers, and facilities. 29 C.F.R. § 825.106(a). The question is still one of control, but the factors courts consider include: (1) whether there is an arrangement between employers to share an employee's services or to interchange employees; (2) whether one employer acts directly or indirectly in the interest of the other employer in relation to the employee; and (3) whether the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer. *Id.* Moreover, no single criterion determines whether a joint employment relationship exists pursuant to the FMLA, but rather the entire relationship must be viewed in its totality. *Id.* § 825.106(b)(1).

### 2.    Analysis

The single integrated enterprise and joint ownership theories are separate and distinct and cover differing, although sometimes overlapping, scenarios. This is one of those overlapping scenarios, where the parties focus on key factors common to both analyses. In particular, Plaintiff contends that there was common management, ownership, and financial control of all three companies; there was centralized control of labor relations; and Defendants' operations were interrelated. Plaintiff also

45

contends, based on largely the same evidence, that Defendants each possessed and shared control over Plaintiff's employment, and essentially made employment decisions together as a group, such that they should be considered joint employers for purposes of aggregating employees.[15]

Plaintiff sets forth the following evidence: First, it is undisputed that Krumper was an owner of, and employed by, all three Defendants. Plaintiff contends that Krumper was also the Chief Executive Officer of all three Defendants, Pl. SMF at ¶ 2, but this is a fact that is contested by Defendants, who alleged that Krumper had no formal title with any Defendant and that each Defendant was run by other bosses. Def. Resp. SMF at ¶ 2. In addition to Krumper, Makrides was the Chief Financial Officer of Tellworks and Eagle, and he also provided financial consulting services for Empire. Finally, Underwood was the Human Resources Manager for all three companies, and

_____

[15] It bears noting that joint ownership is not presented as a basis for establishing any particular Defendant as an employer of Plaintiff for purposes of liability under Title VII or the FMLA. It appears to be undisputed that each Defendant was an employer of Plaintiff's and that each of them subjected her to an adverse employment action, *i.e.*, termination.

Defendants argue that the joint employer theory is wholly inapplicable on this basis, that is, because Plaintiff is not attempting to ascribe employer status to an independent entity on the basis of a contract or other relationship with Plaintiff's nominal employer. But as *McKenzie* explains, the joint employer doctrine is applicable not just to ascribing employer status, such as between a placement agency and its corporate customer. Rather, the doctrine also applies to determining whether the aggregate employee levels of Title VII and the FMLA are reached in cases of multiple potential employers.

she testified that she worked a total of forty hours per week for Defendants and that no one Defendant required more time than the other.

Second, Plaintiff points to undisputed evidence that she and seven other employees who worked in the corporate offices of Defendants were all employed by and worked simultaneously for all three Defendants.

Third, it is undisputed that Lefkoff was controller for all three Defendants from 2009 until 2013, when Hughes was hired to do the same job. Lefkoff was responsible for financial statements and accounting for all Defendants. In addition, Lefkoff functioned as Plaintiff's supervisor from the time she was hired until he left. Lefkoff then trained Hughes, and Hughes went on to supervise Plaintiff on behalf of all Defendants.

Fourth, the Defendants share a corporate headquarters office. Within that office, Krumper and Makrides, in addition to Lefkoff then Hughes, supervised Plaintiff– regardless of which Defendant she was performing services for.

Defendants do not dispute that they shared some common management and ownership. But Defendants demonstrate that ownership, while overlapping, is not identical, and that some co-owners have ownership interests in fewer than all Defendants. Defendants also dispute that Krumper had overall management authority at all three companies, as stated above. Defendants assert that, while Plaintiff,

47

Underwood, and other common employees did not specifically allocate their time as among Defendants, they were paid separate checks. Defendants have also shown that while they shared common managerial staff in a common office, they maintained separate operations and locations around the country, and that most employees of these organizations worked only for a single Defendant.

In the undersigned's judgment, these issues present a quintessential factual dispute for a jury on both an integrated employer and joint employer theory. "Both theories concentrate on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based," *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998), and here, there is conflicting evidence as to the control each of the separate Defendants truly had with regard to the decisions relating to Plaintiff's termination and other matters regarding her employment.

For example, the witnesses conflict on basic matters such as who Plaintiff reported to with regard to her work for each company. Plaintiff has introduced evidence, through the deposition of HR manager Underwood, that Krumper was the CEO and therefore ultimate supervisor controlling operations at all three companies. Pl. SMF at ¶ 2; Underwood Dep. [51] at 11-12. Defendants refute this, however, asserting for example that Schmeelk served as Plaintiff's boss while she worked at

48

Empire. Def. Resp. SMF at ¶ 2; Krumper Dep. at 134; Schmeelk Dep. at 7. While ownership and management was not entirely coextensive, there is no question that the three companies shared extremely close ownership, several common and high ranking officers (including, according to Plaintiff's evidence, the same CEO), and shared the same administrative staff including Plaintiff and Underwood.

Moreover, the question of integrated or joint employment status is a fact-intensive analysis that involves weighing numerous factors and making determinations based on the totality of the circumstances. In this case, where different factors could be seen as pointing in different directions, it is not the province of the Court to declare as a matter of law what the ultimate conclusion should be.

For example, it may bear in Defendants' favor that Plaintiff was paid separately from each Defendant in equal installments from separate payrolls and that, viewing the evidence in the light most favorable to Defendants, Plaintiff worked roughly equally for each Defendant. On the other hand, the evidence in the light most favorable to Plaintiff could lead to a different inference, that is, that her pay for any individual Defendant was not necessarily correlated or intended to be correlated with the amount of work for that Defendant. While she estimates that she ultimately, in total, worked about the same for each Defendant, she was never asked to actually keep track of the time she spent for each Defendant, there was no division of time between

which company she worked for at any given moment, and no one monitored how much time she or the other "shared" employees devoted to each. Def. SMF at ¶ 23; Pl. Resp. SMF at ¶ 23; Pl. Dep. at 60-61; Underwood Dep. at 24.

In terms of centralized control of labor relations, this factor tends to weigh in Plaintiff's favor at least as it relates to the shared employees such as herself. Viewing the evidence in the light most favorable to Plaintiff, Underwood served as the Human Resources Manager for all Defendants. Underwood Dep. at 8-9, 17-18, 20. Krumper or Makrides made the decision about which employee was to work for each company, and Underwood then handled the new hire paperwork and payroll for all three companies. Underwood Dep. at 10-11, 25. In addition, Plaintiff had short-term disability insurance benefits, ostensibly provided by Tellworks, but it covered her employment with all three Defendants. Similarly, full-time salaried employees of Tellworks, Eagle, and Empire had health insurance coverage solely under Tellworks's health insurance plan.

This factor may be also demonstrated by such "indicia of control" as the authority to hire, transfer, promote, discipline, or discharge; authority to establish a work schedule or to direct work assignments; and the obligation to pay or duty to train the charging party. *Lyes*, 166 F.3d at 1345. Here, viewing the evidence in the light most favorable to the Plaintiff, a factfinder could conclude that Defendants made

50

unified decisions as to whether and on what terms to hire Plaintiff, whether and how much of a raise to offer her, whether to provide Plaintiff leave and on what terms, and ultimately whether, when and how to fire her. Indeed, there does not appear to have been separate and independent decision-making processes as to these personnel matters, including, ultimately, as to her termination.

Rather, it could be concluded that the decisions were made together for all three Defendants as a whole, with Makrides and Krumper deciding to terminate Plaintiff for all three companies as a whole. Not only was Plaintiff terminated by all three Defendants via one telephone call, but only one separation notice was filled out, and it was completed solely by Underwood at the direction of Krumper. Underwood Dep. at 79. Indeed, this was so, notwithstanding that Plaintiff has introduced evidence suggesting that at least Schmeelk, supposedly her boss at Empire, did not insist that she be terminated. Schmeelk Dep. at 40-42. In fact, the strongest thing that Schmeelk said with regard to his "recommendation" of whether to fire Plaintiff was that he had no issues with Draper and enjoyed working with her. *Id.* Schmeelk did not even recall Makrides saying that they were considering or trying to decide whether to terminate Plaintiff nor did he remember having a conversation with Makrides about this in the days before Plaintiff was to return. *Id.* That the termination decision was necessarily made anyway suggests that personnel decisions for the shared office support staff such

51

as Plaintiff were made together as a unified whole, rather than independently. This joint decision-making as to the terms of employment, discipline, and termination, is strong evidence either that Defendants operated as a single unit for purposes of the employment decisions at issue in this case, or that they (as otherwise independent companies operating as classic joint employers) delegated control to their common executive staff to make a single decision relating to a shared employee. Either way, viewed in the light most favorable to Plaintiff, this factor strongly supports aggregation on either a consolidated or joint employer theory.

When the conflicting evidence is viewed in Defendants' favor, the conclusions are less clear. According to Defendants, the three companies effectively had different officers exercising day-to-day control over operations, and the fact that they all independently agreed to terminate Plaintiff does not suggest delegation of any control, much less that these companies were, essentially, alter egos of each other.

Other factors weigh also towards Defendants when the evidence is regarded in the light most favorable to them. There is no evidence of any shared finances and, other than for the shared administrative offices in Atlanta, most employees and office locations nationwide are distinct. Moreover, the companies serve different functions and industries and have different operations. While they paid Plaintiff in equal amounts without any determination of how much she worked for each Defendant, they

52

paid her (and the other shared employees) with separate paychecks from presumably separate payrolls. The companies file different tax returns and otherwise maintain different accounts. And while one Defendant (Tellworks) furnished health coverage, the other two Defendants reimbursed Tellworks for their share. A factfinder viewing this evidence in the light most favorable to Defendants would find that the observation of basic corporate formalities, the mostly distinct operations, staff and locations, and the separation of finances, weigh significantly against a consolidated employer theory. The factfinder could also find from the formal separation of payroll and benefits that such independent companies did not necessarily delegate their control and decision-making over personnel by simply cooperating and consulting on employment decisions.

Defendants, citing *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 443 (4th Cir. 1999) and *Clark v. St. Joseph's/Candler Health System, Inc.*, 2006 WL 2228929 at *5 (S.D. Ga. Aug. 3, 2006), point to the following factors that courts look to in deciding whether operations are interrelated: (1) whether each company operates at separate locations; (2) whether each company files separate tax returns; (3) whether each company holds separate shareholder and Board of Directors' meeting; (4) whether each company conducts separate banking operations; (5) whether each company enters into separate lease agreements; (6) whether each company is managed day-to-

day by the same person; (7) whether each company shares office space; and (8) whether each company separately pays for the plaintiff's salary and benefits.

In *Clark*, 2006 WL 2228929 at *5, the court found that the employers at issue were separate, independent entities from an operational perspective despite the fact that one company utilized office space provided by another and that one company provided payroll services and access to some healthcare and other benefits to the other company's employees. The court weighed this information against the fact that the companies maintained their own bank accounts, offices, equipment, and storage facilities– and kept separate business records and performed their own marketing. In that case, the companies' offices were deemed to be "separate." Specifically, though one company provided the other company with office space, they did not share the space provided. In addition, the fact that one company issued payroll checks to employees of the other company was not enough to indicate that these were integrated operations. Because the second company reimbursed the one issuing payroll checks, including salary costs and benefits paid, the court found that the companies were separate entities.

The *Clark* decision does not counsel in favor of granting either party summary judgment on the issue. To be sure, *Clark* supports Defendants' focus on various factors, including its separation of finances and corporate formalities, and also

54

supports Defendants' argument that merely sharing payroll for a common employee does not create a single or joint employment relationship. On the other hand, Plaintiff's case (viewed in the light most favorable to her) is much stronger than Clark's was, because she has put forth evidence showing a complete consolidation and sharing of key administrative staff and office operations; unified management, in the form of the same supervisor (Lefkoff, and then Hughes) at all three companies and ultimately, according to Plaintiff, the same CEO (Krumper); highly overlapping ownership; and evidence that could be seen as all three companies allowing their joint and overlapping managers to make unified decisions as to all matter relating to Plaintiff's employment including her termination.

Accordingly, because there is evidence supporting both sides in the highly fact intensive questions of integrated and/or joint employership vis-a-vis the adverse employment actions at issue in this case, the Court cannot find as a matter of law in either party's favor and therefore **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment [39] be **DENIED** and that Defendants' Motion for Summary Judgment [42] be **DENIED** with respect to Plaintiff's FMLA claims to the extent they

55

argue Plaintiff did not work the requisite number of hours for any individual Defendant to trigger eligibility under the FMLA.[16]

D.   *Defendants' Motion for Summary Judgment*

1.   Plaintiff's Title VII Claim

Plaintiff alleges pregnancy and gender discrimination under Title VII, as amended by the PDA, and the Civil Rights Act of 1991.

a.   Standards of Proof Under Title VII

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory

---

[16]Because issues of disputed fact exist as to whether to aggregate the Defendants' workforces for purposes of the FMLA, the Court cannot reach the additional issues raised by Plaintiff's Motion for Summary Judgment. Specifically, Plaintiff requests summary judgment in her favor on the questions of whether Defendants on a joint or consolidated basis employed at least 50 people during the 20 week period in the current or preceding calendar year of her FMLA leave, and whether Defendants also so employed at least 50 people within 75 miles of Plaintiff's worksite. Plaintiff presents these employee statistics on an aggregate basis in her Statement of Material Facts, and therefore these facts must be considered to be disputed for all of the reasons discussed above. Also, as noted above, Plaintiff presents no evidence of the geographic distribution of Defendants' employees during the time period relevant to her FMLA eligibility, which is an additional reason why summary judgment cannot be granted in her favor on that issue.

intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-981 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983).

"Discrimination claims brought under Title VII are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, was a motivating factor for an adverse employment action, even though other factors also motivated the action. *See id.* By contrast, single-motive claims, *i.e.*, pretext claims, require a plaintiff to show that bias was *the* true reason for the adverse action. *Id.* Both single-motive and mixed-motive claims can be established with either direct or circumstantial evidence. *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." BLACK'S LAW DICTIONARY 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-

82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998).

Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent. In both mixed-motive and single-motive discrimination claims, circumstantial evidence may be sufficient to prove a plaintiff's case. *See Quigg*, 814 F.3d at 1237; *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997).

For single-motive discrimination claims, under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *see also Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1310, *reh'g*

*denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Combs*, 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones*, 137 F.3d at 1310-1311; *Holifield*, 115 F.3d at 1562; *see Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. This burden is "exceedingly light" in comparison to the burden required if the plaintiff has presented direct evidence of discrimination. *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988). If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs*, 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional

discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529.

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.*, 738 F.2d at 1184 (quoting *Aikens*, 460 U.S. at 713-14); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

Nevertheless, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a

summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff also may defeat a motion for summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted).

In the mixed-motive claim context, the Eleventh Circuit has rejected the *McDonnell Douglas* framework as "inappropriate" and "overly burdensome." *Quigg*, 814 F.3d at 1237. In particular, the Eleventh Circuit found that there is a "clear incongruity between the *McDonnell Douglas* framework and mixed-motive claims" because in order to meet her burden under *McDonnell Douglas*, a plaintiff must show that her employer's purported legitimate reason for terminating her employment never motivated the termination. *Id.* But, under a mixed-motive claim, it is an essential part of the theory of causation that an employer's legitimate reason may have partially motivated the termination decision– so long as the employer was also motivated by an illegitimate reason. *Id.* Accordingly, the *Quigg* test only requires a plaintiff to offer evidence that the defendant took an adverse employment action against her and that a protected characteristic was a motivating factor for the defendant's action. *Id.*

b.      Pregnancy Discrimination

Plaintiff has brought claims of pregnancy discrimination under Title VII, as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k). Congress added Section 701(k) to Title VII in 1978 specifically to add discrimination on the basis of pregnancy and pregnancy-related conditions as a type of sex discrimination. This section, the PDA, provides in relevant part:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k); *see also Byrd v. Lakeshore Hosp.*, 30 F.3d 1380, 1381-1382 (11th Cir. 1994).

Congress passed the PDA to reverse the holding in *General Electric Company v. Gilbert*, 429 U.S. 125, 136 (1976) that an otherwise comprehensive disability insurance plan did not violate Title VII when it failed to cover pregnancy-related disabilities. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678–79 (1983); *Byrd*, 30 F.3d at 1383. "Rather than introducing new substantive provisions protecting the rights of pregnant women, the PDA brought discrimination on the basis of pregnancy within the existing statutory framework prohibiting

sex-based discrimination." *Armstrong v. Flowers Hosp. Inc.*, 33 F.3d 1308, 1312 (11th Cir. 1994). The PDA was designed to ensure that pregnant employees are given the same opportunities and benefits as non-pregnant employees who are similarly limited in their ability to work. *See Byrd*, 30 F.3d at 1382. If an employee's pregnancy actually prevents her from fulfilling the duties of her position, her employer is not obligated to give her preferential treatment. *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999) ("The PDA does not require that employers give preferential treatment to pregnant employees.").

Because discrimination on the basis of pregnancy or a pregnancy-related condition is a type of discrimination based on sex, courts have applied the same analysis to claims of pregnancy discrimination that they apply to other claims of sex discrimination, including the *McDonnell Douglas* framework described above in cases involving circumstantial evidence of discrimination. *See Armstrong*, 33 F.3d at 1312–13 (citing *Maddox v. Grandview Care Ctr., Inc.*, 780 F.2d 987, 989 (11th Cir. 1986)); *Byrd*, 30 F.3d at 1381-1383.

Direct evidence in pregnancy discrimination cases is generally in the form of an admission by a decisionmaker that an employee's pregnancy affected an employment decision, such as suspending or terminating an employee because she was pregnant or delaying hiring an applicant until after she has delivered her baby.

63

*See, e.g.*, *EEOC v. Wal-mart Stores, Inc.*, 156 F.3d 989, 990–92 (9th Cir. 1998); *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 421 (1st Cir. 1996); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Here, Plaintiff has alleged that she was discriminated against based on her sex when she was not allowed to return to work, and was terminated, following her maternity leave. Plaintiff argues that her pregnancy discrimination claim should survive summary judgment under two, alternative theories of sex discrimination. First, Plaintiff alleges mixed-motive discrimination on the basis of her sex and pregnancy.[17] In the alternative, Plaintiff alleges a single-motive theory of discrimination. In mixed-motive cases, the Eleventh Circuit applies the test set out in *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016). In a single-motive discrimination claim under Title VII, courts will apply the *McDonnell Douglas* burden-shifting test.

In the Complaint, Plaintiff asserts that Defendant discriminated against her on the basis of her sex (female) in violation of Title VII. Specifically, Plaintiff alleges that Defendants' decision to terminate her was due to her pregnancy and her taking FMLA qualifying leave. Plaintiff contends that she has produced some direct evidence

---

[17]In particular, Plaintiff argues that *Quigg* and the mixed-motive framework are appropriate because Defendants asserted the affirmative defense that, even if they discriminated against Plaintiff, they would have made the same decision anyway, regardless of the discriminatory motivations.

of discriminatory intent, pointing specifically to the fact that Makrides told Plaintiff

that she should have gotten a dog instead of getting pregnant. However, Plaintiff "for

purposes of summary judgment . . . will assume these comments are circumstantial,

not direct evidence."[18] [58] at 7. Thus, Plaintiff's claim of single-motive sex

discrimination rests purely on circumstantial evidence and must be analyzed under the

*McDonnell Douglas-Burdine* framework. Plaintiff's claim of mixed-motive sex

discrimination, which also rests entirely on circumstantial evidence, must be analyzed

under *Quigg*.

c.      Single-Motive Claim

(1)      Plaintiff's *Prima Facie* Case

Under the *McDonnell Douglas-Burdine* framework, a plaintiff can generally

establish a *prima facie* case of unlawful discrimination under Title VII by showing

that: 1) she is a member of a protected class;[19] 2) she was subjected to an adverse

---

[18]Regardless, this evidence is inadmissible, as noted above, because Plaintiff's Exhibit 62 was not signed and sworn to under penalty of perjury, so the Court does not consider it.

[19] Although courts continue to include the requirement that a plaintiff establish as part of a *prima facie* case that he or she is a member of a "protected class," it is clear that individuals of any sex, race, or religion may pursue claims of employment discrimination under Title VII. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1290 n.3 (11th Cir. 1999) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976)). Thus, the key element of the *prima facie* case is establishing that persons outside of the plaintiff's protected classification (*i.e.*, those of a different sex,

employment action by her employer; 3) she was qualified to do the job in question; and 4) her employer treated similarly situated employees outside her protected classification (*i.e.*, those of a different sex, race, or religion) more favorably than it treated her. *See McDonnell Douglas*, 411 U.S. at 802; *see also Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

In this case, Defendants do not contest that Plaintiff was subjected to an adverse employment action, in the form of termination, that she was a member of a protected class, or that she was qualified for the job. Instead, Defendants argue that Plaintiff cannot establish a *prima facie* case of discrimination on the basis of pregnancy because she cannot show that any similarly situated employees were treated more favorably than she was. If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate if no other evidence of discrimination is present. *Holifield*, 115 F.3d at 1562.

Here, Plaintiff points to three employee comparators: Defendants' Human Resources Manager Underwood, Eagle's Regional Director of Operations Graffius, and Defendants' receptionist Ebo. Plaintiff argues that each of these comparators took

---

race, or religion) were treated more favorably by the employer. *See Wright*, 187 F.3d at 1290 n.3.

leave, but none of them took maternity leave, and none of them were terminated. It is undisputed that Underwood took three months' leave in 2012 after getting her hip replaced and that she was able to return to work following her leave. Moreover, it is undisputed that Underwood worked from home and was paid her full salary for the duration of her leave. Similarly, Graffius, who is male, took leave following the birth of his child and later returned to work without penalty. He, too, was paid during his leave and was allowed to work remotely. Finally, Ebo was granted two to four weeks of leave due to breast cancer surgery. While on leave, she was paid her regular salary and did not have to use any of her vacation or sick time.

Viewing the evidence in the light most favorable to Plaintiff, there is also, in some sense, another comparator to consider, which is how Plaintiff herself was treated before she announced her pregnancy and took pregnancy leave. Viewing the evidence in the light most favorable to her, many of the sarcastic email communications were known to Defendants well before she took leave. Pl. Dep. at 43, 49; Ex. 10. While Makrides claims that he suddenly learned of Plaintiff's inappropriate communications and her difficulties with interpersonal relations within a day or so of her return, there is evidence to dispute this. Specifically, there is evidence suggesting that the issues were known and discussed all along. *Id.*;  Krumper Dep. at 81-82; 216-17; Parsifal Dep. at 21-22. Yet Plaintiff was not terminated until after she announced her

pregnancy, took leave, and was within a day or so of her return. Whether viewed as "comparator" evidence or simply part of the overall mosaic of circumstantial facts, the timing of the termination decision relative to when Defendants knew of Plaintiff's alleged inappropriate communications is relevant to the question of Plaintiff's *prima facie* case.

In the totality of all of the evidence relevant to discriminatory intent, the Court also considers the various derogatory comments that relevant supervisors made about Plaintiff's pregnancy. Makrides told Leah Kendrick, one of Plaintiff's co-workers, that Plaintiff's pregnancy was a big mistake and she never should have gotten pregnant. In addition, Krumper, the other decision-maker, had a conversation with Kendrick soon after Plaintiff disclosed that she was pregnant. Kendrick went to Krumper's office and told him she needed to speak with him about something. His response was "[y]ou better not be fucking pregnant too." Kendrick Dep. at 28, 31. The hostility of the decision-makers when it came to Plaintiff's pregnancy, along with the fact that they treated Ebo, Underwood, and Graffius differently with respect to their leave, and terminated Plaintiff during her pregnancy leave for reasons that they, at least in part, were aware of prior to the pregnancy, is at least minimally sufficient to meet the low threshold of the *prima facie* case.

(2)     Defendants' Legitimate Non-Discriminatory Reason

Once a plaintiff has stated her *prima facie* case for discrimination under Title VII, the *McDonnell Douglas-Burdine* burden-shifting framework requires the defendant to proffer a legitimate, non-discriminatory reason for its employment decision. *McDonnell Douglas*, 411 U.S. at 802. This burden is "exceedingly light" and requires only that the employer articulate a clear and reasonably specific basis for its actions. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769–70 (11th Cir. 2005).

Defendants have presented sufficient evidence that they had legitimate, non-discriminatory reasons for terminating Plaintiff's employment. Defendants purportedly terminated Plaintiff's employment because of her bad attitude and hostile temperament, both of which purportedly came to light while Plaintiff was on leave. This reason is supported by evidence, some of which is noted above, including the complaints of Hughes regarding Plaintiff's text messages with Krumper. Additionally, Defendants cite Makrides's testimony that Schmeelk and Parsifal told him they did not want Plaintiff to come back to work because of her behavior and attitude, all of which (according to Defendants) came to light within a few days of Plaintiff's scheduled return to work.

Thus, the Court finds that Defendants have presented evidence that they had a legitimate reason to terminate the Plaintiff's employment that was unrelated to her

pregnancy. Under the *McDonnell Douglas* framework, the burden shifts to Plaintiff to present sufficient evidence that the Defendants' alleged reason for her termination was a pretext for unlawful discrimination.

(3)   Pretext

Upon a defendant's showing of legitimate, non-discriminatory reasons for terminating a plaintiff, the plaintiff must present evidence that the defendant's proffered reasons were mere pretext for discriminatory intent. *See Burdine*, 450 U.S. at 253–54. A plaintiff may carry her burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. A plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804.

70

A plaintiff may carry her burden of establishing pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). However, "[a] reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. Cty. Comm. of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Because a plaintiff bears the burden of establishing that a defendant's reasons are a pretext for discrimination, a plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young*, 840 F.2d at 830; *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993).

71

Defendants argue that because Plaintiff testified that she "does not know" why her employment was terminated, and because "she has not pointed to any evidence to rebut the reasons for her termination as articulated by Defendants . . . [she] cannot show that her termination was pretext for discrimination." [42-1] at 20.[20]

Contrary to Defendants' contention, however, Plaintiff has presented evidence that directly rebuts Defendants' purported legitimate non-discriminatory reason for her termination. As recounted above, Plaintiff has presented evidence that Defendants were hostile when she became pregnant and that "things changed" once she informed her employers that she was pregnant. Specifically, soon after Plaintiff told her employers that she was pregnant, her co-worker, Kendrick, approached Krumper and told him she needed to talk to him. Krumper's response was that she "better not fucking be pregnant too." Kendrick Dep. at 28, 31. Similarly, Makrides told Kendrick that Plaintiff's pregnancy was a big mistake, and she never should have gotten pregnant. *Id.* at 28.

In addition to the decision-makers' hostility toward Plaintiff's pregnancy, Defendants' shifting reasons for firing Plaintiff are indicative of pretext. As noted above, Plaintiff's separation notice, and the reasons she was told verbally, indicated

---

[20]As to this, the record evidence makes clear that Plaintiff believes she was terminated because she had gotten pregnant, had taken leave, and because her replacement was willing to do the same job for less money. *See* Pl. Dep. at 74.

that she was terminated because of corporate "restructuring" and job elimination. Later on, in their first response to Plaintiff's EEOC Charge of Discrimination, Defendants contended that Plaintiff was terminated because Draper, her temporary replacement, was doing a better job than she was. In particular, Defendants noted that Draper "managed her workload more efficiently, and had a stronger skill set (including better communication skills)" than Plaintiff. Pl. Ex. 23. However, when both Krumper and Makrides were asked whether Draper had a better "skill set" than Plaintiff or whether Plaintiff's "skill set" as compared to Draper's provided a basis for her termination, both decision-makers answered in the negative.

Defendants submitted a follow-up letter to the EEOC on December 19, 2014, which stated "Ms. Draper also had better interpersonal skills than Charging Party. Specifically, Ms. Draper had a positive attitude and got along well with her co-workers, while Charging Party was often rude to her coworkers and was unwilling to assist others." Def. Resp. Add. SMF at ¶ 57.

To be sure, the fact that an employer provides additional justifications for a decision over time, or provides additional details, does not itself show pretext, if those reasons are not contradictory or inconsistent. *See, e.g., Zaben v. Air Prods. & Chemicals, Inc.*, 129 F.3d 1453, 1458 (11th Cir. 1997) (noting that the defendant "gave difference explanations for the selection of employees to be discharged" but

that those reasons were not "necessarily inconsistent"). But the facts in favor of pretext could be seen as stronger here. Defendants' more recent focus on Draper's supposed superior skills and/or attitude can be seen as wholly inconsistent with the original reason provided on Plaintiff's separation notice– a corporate restructuring and elimination of the position. Indeed, it is undisputed that there was no such restructuring or job elimination. And choosing another candidate who is better at performing the job is fundamentally inconsistent with the suggestion that the job itself is eliminated, or at least a jury could infer that viewing the evidence in Plaintiff's favor. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) (determining that, in viewing the evidence in the light most favorable to the plaintiff, shifting reasons given by the decision-maker for why certain behaviors were prohibited– though it did not change that Plaintiff was terminated for engaging in those behaviors– went to the decision-maker's credibility and was therefore evidence of pretext).

Defendants argue that the existence of possible additional non-discriminatory reasons for a termination decision does not create an inference of pretext. Citing *Tidwell v. Carter Prod.*, 135 F.3d 1422, 1428 (11th Cir. 1998), Defendants claim that their inconsistencies fail to amount to pretext. In *Tidwell*, the Eleventh Circuit reviewed the district court's decision to allow the case to go to trial and found that it

74

had erred. *Id.* at 1427-28. The plaintiff was told he was being terminated because of a "realignment of territory"– and, in fact, the company was undergoing territory realignments. *Id.* The defendant maintained throughout the course of the litigation that this reorganization was the reason for its decision to terminate the plaintiff. *Id.* The plaintiff argued that the defendant was giving shifting reasons that would allow a reasonable factfinder to infer pretext, however, because the defendant had noted in a memo that the plaintiff had a performance issue. *Id.* The court found that "[a]lthough the identification of inconsistencies in an employer's testimony can be evidence of pretext . . . the examples in this case do not present such a situation" and that "the existence of a possible additional non-discriminatory basis for [the plaintiff's] termination does not . . . prove pretext." *Id.* at 1428.

*Tidwell* is inapposite. While it is true that shifting reasons will not always be evidence of pretext, in this case, the wide-ranging reasons given for Plaintiff's termination, are neither the sole evidence of pretext nor have Defendants been offering the same reason since their separation notice. Instead, Defendants referenced a restructuring that never occurred– and have provided no evidence that it was ever going to occur. They later justified Plaintiff's termination under the guise that Draper was better at doing the job, which by definition was not actually eliminated. However, both Makrides and Krumper denied that Draper had a skill set that Plaintiff lacked.

Perhaps the most basic indications of pretext are the fundamental contradictions that a jury could see in the explanations and justifications for the otherwise facially-odd timing of Plaintiff's termination, *i.e.*, one day before she was to return. The explanation centers on the surprising claim that Makrides somehow suddenly happened upon all of this evidence of Plaintiff's bad attitude, all within a day or two of her return. All of this suggests pretext.

This claim in itself might raise an eyebrow or two in the jury room. But then the situation becomes muddier as contradictions emerge among the sources that Makrides cites for his supposed last-minute revelations. Makrides testified that he spoke with Parsifal, Schmeelk, and Hughes, and that each one of them complained about Plaintiff's bad attitude and negative influence in the workplace, providing the "newly discovered" information that led to Plaintiff's termination. However, Parsifal testified that he talked to Makrides about different employees, including Plaintiff, on various occasions, including before Plaintiff went on maternity leave. Parsifal did not, however, remember talking to Makrides about Plaintiff while she was on maternity leave much less within just days of her return. Parsifal also testified that he does not remember having a conversation with Makrides about whether Plaintiff should return from leave, though Makrides testified that Parsifal was adamant that he did not want to "re-experience" working with Plaintiff.

As to Schmeelk, Makrides also testified that he was a source of newly discovered information about Plaintiff's attitude problems and that Schmeelk was adamant that Plaintiff be terminated. Schmeelk, however, initially testified at his deposition that Makrides asked only about Draper, the person filling in for Plaintiff, and that he told Makrides that he had no issues with Draper and enjoyed working with her. Schmeelk further testified that he did not recall Makrides saying that Defendants were considering terminating Plaintiff, did not remember having a conversation with Makrides in the days before Plaintiff's return, and was not "adamant" that Plaintiff be terminated. Finally, Schmeelk testified that he spoke with Krumper before Plaintiff went on leave about his concerns with regard to Plaintiff– but had no recollection of speaking with Krumper in the days before Plaintiff was terminated.[21]

Finally, Makrides testified that he went to Hughes after Krumper told him that certain people were of the opinion that Plaintiff should not return to work. Hughes was not, however, one of the people who Krumper claimed came to speak with him

---

[21] Schmeelk has since put forth additional testimony, in the form of a declaration, that states that he did, in fact, speak with Krumper and Makrides about Plaintiff's bad attitude and unprofessional demeanor while Plaintiff was on maternity leave. But, at a minimum, the significant improvements in the apparent strength of Schmeelk's recollection from his deposition to this declaration would be a basis for a juror to question his credibility. Viewing the deposition testimony in the light most favorable to Plaintiff, a juror could find that it fails to support Makrides's account of events.

about Plaintiff. Instead, Krumper testified that Schmeelk, Parsifal, Nettles, and "the accounting girl from up in Nashville"[22] had complained about Plaintiff. Regardless, Makrides testified that Hughes complained that Plaintiff was gossiping, snooping around the office, and going behind his back to ownership. Though both Makrides and Krumper testified that Plaintiff was acting for Krumper as his "eyes and ears" – *i.e.*, that they knew she was going around employees' backs to ownership at Krumper's specific request– they still claim that Hughes's complaints were new to them, and part of the reason for their decision to terminate Plaintiff's employment.

At the very least, the deposition testimony that fails to support and even contradicts Makrides's timeline is sufficient to raise a question as to Makrides's credibility. More directly, the testimony as a whole, viewed in Plaintiff's favor, contradicts Makrides's basic claim to having suddenly learned of concerns about Plaintiff's attitude just shortly before her return. That evidence rather suggests that much of this information was known before Plaintiff's leave. This timing contradicts Makrides, and as explained earlier, permits the inference that Plaintiff's termination resulted from other reasons. When taken together with the comments made by both Krumper and Makrides, which suggest hostility towards Plaintiff's and Kendrick's

---

[22]Krumper, however, later testified that the "girl in Tennessee" did not actually complain to him about Plaintiff. Krumper Dep. at 144.

pregnancies, along with the contradictory series of justifications put forth by Defendants for Plaintiff's termination, all of this is more than sufficient to meet the burden required to show pretext, and Plaintiff's Title VII claim under the single-motive theory should go forward. Therefore, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment as to Count I be **DENIED**.

d.    Mixed-Motive Analysis

Under the *Quigg* framework, adopted from the Sixth Circuit's ruling in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008), a plaintiff asserting a mixed-motive claim will survive a defendant's summary judgment motion so long as she produces evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against her and (2) a protected characteristic was *a* motivating factor for the defendant's adverse employment action. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1232-33 (11th Cir. 2016). With a mixed-motive claim, the Court must determine "whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that her protected characteristic was a motivating factor for an adverse employment decision." *Gosa v. Wal-Mart Stores East, LP*, 2017 WL 457198, at *8 (S.D. Ala. Feb. 2, 2017) (quoting *Quigg*, 814 F.3d at 1239) (quotation marks and other citations

omitted). The test, therefore, is more lenient for a plaintiff than that required to bring a single-motive claim.

Defendants argue that Plaintiff cannot meet her burden under *Quigg* because she has not shown that any gender, maternity, or pregnancy-related statements (1) were made during discussions of Plaintiff's employment or the decision to terminate her employment, (2) were made during the pendency of Plaintiff's leave or otherwise in close temporal proximity to the decision to terminate her employment, or (3) specifically referred to filling Plaintiff's position with a non-pregnant employee. In essence, Defendants contend that the only way to set forth enough circumstantial evidence to satisfy the mixed-motive *Quigg* test is to set forth the same kind of evidence as that considered by the *Quigg* Court.[23]

In *Quigg*, the Eleventh Circuit considered whether the Thomas County School District had discriminated against the plaintiff based on her sex or gender when it

---

[23]Defendants also drop a footnote that cites *E.E.O.C. v. TBC Corp.*, 532 F. App'x 901, 902-903 (11th Cir. 2013), and *Greene v. Saia Motor Freight Line, LLC*, 2016 WL 916512 at *1, n.1 (M.D. Fla. Mar. 10, 2016), for the proposition that a mixed-motive claim must be pled in a plaintiff's complaint or raised in the proceedings. However, the court in *E.E.O.C.* specifically found the opposite: that the district court erred by refusing to consider the argument that the defendant acted with mixed motives and that the plaintiff "was not required to identify its method of proof in its complaint." 532 F. App'x at 902. To the extent that the court in *Greene* found that the plaintiff had failed to plead a mixed-motive case, so *Quigg* did not apply, the Court notes that the decision is not binding, was issued only two weeks after *Quigg* was decided, and does not explain its rationale.

refused to renew her contract. 814 F.3d at 1241. The plaintiff's proffered evidence that the defendant was motivated at least in part by discriminatory intent was based solely on statements made by members of the school board. *Id.* The court therefore looked to whether the plaintiff had shown that "the circumstances surrounding the remarks create[d] a genuine issue of material fact that the employer 'actually relied on her [sex or] gender in making its decision.'" *Id.* (quoting *Price Waterhouse v. Hopkins*, 290 U.S. 228, 251 (1989). Thus, the court relied on the fact that the statements were made (1) during conversations about whether to renew Quigg's contract, (2) in relative temporal proximity to the vote, and (3) specifically referring to the gender composition of the office of the superintendent. *Id.* at 1241-42. This was not a rigid test laid out by the Eleventh Circuit, but rather were factors the court looked to in order to distinguish the statements "from stray remarks." *Id.* at 1242.

In this case, Plaintiff cites much of the same evidence in support of her mixed-motive analysis as she did with respect to her single-motive analysis. For all the reasons discussed above, that evidence, viewed in the light most favorable to Plaintiff, supports the inference that her pregnancy was at least a motivating factor in her termination.

Accordingly, the Court finds that Plaintiff has adequately set forth a claim for mixed-motive sex discrimination on the basis of her pregnancy.

81

### 2.    Plaintiff's FMLA Claims

Plaintiff also asserts claims against Defendants under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.* Plaintiff has asserted two separate claims against Defendants under the FMLA. In Count II, she asserts a claim for interference under the FMLA. Compl. at 12. In Count III, she asserts a claim for retaliation under the FMLA. Compl. at 13.

### a.    Standards of Proof Under the FMLA

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). It is also "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). An employee alleging that her rights under the FMLA have been violated by an employer may assert two types of claims: interference claims, in which the employee asserts that her employer refused to provide her with the rights granted under the FMLA, and retaliation claims, in which the employee alleges that her employer retaliated against her for exercising her rights under the FMLA or for opposing any activity made unlawful under the FMLA. *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001); *see also Drago v. Jenne*, 453 F.3d 1301, 1305-08 (11th Cir.

2006); *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000).

In order for an employee to establish a claim based on alleged interference with her rights under the FMLA, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland*, 239 F.3d at 1206–07. An interference claim may be based on an employee's termination prior to the start of her FMLA leave, and the employee need not allege that her employer intended to deny the benefit, because "the employer's motives are irrelevant." *Id.* at 1208.

However, "the right to commence FMLA leave is not absolute, and . . . an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010). But "if an employee is not reinstated, the employer bears the burden of proving that the employee was discharged for independent reasons that were unrelated to the employee's leave." *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241 (11th Cir. 2010) (citing *Parris v. Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 n.1 (11th Cir. 2000)). In *Krutzig*, for example, the court held that an employer was entitled to summary judgment on an

FMLA interference claim because "unrebutted evidence that the decision maker was not aware, at the time of the decision to terminate [the employee], of her request to commence FMLA leave establishes as a matter of law that [the employee's] termination was for reasons other than her requested leave." *Id.*

> b.   Interference Claim

As discussed above, in order for an employee plaintiff to establish a claim based on alleged interference with her rights under the FMLA, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland*, 239 F.3d at 1206–07. To prevail on an interference claim, an employee must show that the employer's conduct resulted in the denial of a benefit to which she was entitled. *See Spakes v. Broward Cnty. Sheriff's Office*, 631 F.3d 1307, 1309 (11th Cir. 2011) ("To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA.") (internal citation omitted). It is Defendants' burden, so long as Plaintiff can show that she was entitled to take maternity leave, to establish that Plaintiff was terminated for reasons independent from, and unrelated to, Plaintiff's leave.

Plaintiff argues that Defendants interfered with her FMLA rights by failing to reinstate her to her position at the conclusion of her leave. Defendants in response invoke the principle that "this reinstatement right is not absolute; rather, 'an employer

can deny reinstatement if it can demonstrate that it would have discharged the employee had she not been on FMLA leave.'" Def. Br. [42-1] at 15 (quoting *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241 (11th Cir. 2010)).

Defendants argue that "the circumstances and facts of this case are strikingly similar [sic] those from *Schaaf*," [42-1] at 16, an Eleventh Circuit case in which the plaintiff argued that "because [the defendant] learned of [the plaintiff's] hostile temperament, ineffective management practices, and administrative ineptitude while she was on leave, it follows that [the defendant] would not have discovered these derelictions had [the plaintiff] *not* taken maternity leave" and therefore "her maternity leave *caused* her demotion." *Schaaf*, 602 F.3d at 1241. Specifically, Defendants argue that it was only after Plaintiff took leave that they "came to realize how her bad attitude and hostile temperament negatively affected their office environments." Def. MSJ [42-1] at 16. That is, Defendants rest on Makrides's testimony that it was only on the Friday before Plaintiff's scheduled Monday return to work that he learned from Hughes, Schmeelk, and Parsifal that Plaintiff had a negative attitude that was impacting others.

The problem with Defendants' argument is that it relies on the same basic disputed point as discussed *ad nauseam* above, *i.e.*, the assertion that Defendants terminated Plaintiff because of her conduct as an employee, which they only

discovered at the end of her leave. Because the Court perceives an issue of fact with regard to this explanation for a jury to resolve, it follows that the Court cannot recommend dismissal of the FMLA interference claim as a matter of law either.

Accordingly, Defendants have not demonstrated based on undisputed facts that they would have terminated Plaintiff regardless of whether she took FMLA leave, and the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment with respect to Count II be **DENIED** and that Plaintiff's FMLA interference claim be allowed to proceed.[24]

### c.    Retaliation Claim

In order to establish a claim for retaliation under the FMLA, the employee must present evidence that her employer subjected her to an adverse employment action and intended to discriminate against her for having exercised her rights under the FMLA. *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1207 (11th Cir. 2001) (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)). Unlike a plaintiff asserting a claim of interference, a plaintiff bringing a retaliation claim under the FMLA faces the increased burden of showing that the adverse employment action was "motivated by an impermissible retaliatory or discriminatory animus." *Id.* In the

---

[24]The Court separately addressed, and recommended denial of, Defendants' threshold challenge to Plaintiff's eligibility under the FMLA based on her insufficient number of hours working for any individual Defendant.

absence of direct evidence, a claim that an employee has been retaliated against for attempting to exercise her rights under the FMLA is analyzed using the *McDonnell Douglas* framework applied to Title VII retaliation claims. *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).

In order to establish a *prima facie* case of an FMLA violation, Plaintiff must demonstrate that: (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment action; and (3) there is a causal link between the exercise of her rights under the FMLA and the adverse employment action. *Brungart*, 231 F.3d at 798; *Parris v. Miami Herald Pub. Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000). If Plaintiff meets this burden, Defendant must come forward with a legitimate nondiscriminatory reason for its action. The burden then shifts back to Plaintiff to demonstrate that the asserted reason is pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

There is no question that Plaintiff requested and took maternity leave, a statutorily protected activity. Nor is there any question that Plaintiff suffered an adverse employment action when she was denied paid leave, denied her one week of accrued leave, and terminated as she was about to return to work. As to Plaintiff's *prima facie* case, then, there is only a dispute as to whether she has shown a sufficient

causal link between her exercise of her FMLA rights and the adverse employment actions.

Defendants first argue that Plaintiff's testimony that she believes she may have been terminated because Draper's salary was lower than hers is a complete bar to her retaliation claim because this testimony means Plaintiff cannot establish that retaliation was the but for cause of her termination. The Court disagrees.

First, Plaintiff's subjective beliefs as to the true reasons for her termination are not themselves evidence of Defendants' actual intentions or reasoning on what they would have done absent Plaintiff's exercise of FMLA leave. Second, Defendants point the Court to no binding precedent illustrating that retaliation claims under the FMLA require but for causation.[25] Third, even if "but for" causation were required, but for cause does not mean sole cause. *See Burrage v. United States*, 134 S. Ct. 881, 888 (2014). What Plaintiff stated was that she believed that she was fired because she had gotten pregnant, taken leave, and because Draper could be paid less for doing the same job. At most, this statement of Plaintiff's "beliefs" suggests that Defendants may

---

[25]And, in fact, it seems that the Eleventh Circuit has yet to directly address the issue of but for cause with respect to FMLA retaliation. *See Coleman v. Redmond Park Hosp., LLC*, 589 F. App'x 436, 438-39 (11th Cir. 2014); *see also Jones v. Allstate Insurance Co.*, 2016 WL 4259753, at *4 (N.D. Ala. Aug. 12, 2016).

have had multiple reasons for their actions, which, in and of itself, is not necessarily proof that none of these were "but for" causes.

As explained in detail above, enough evidence exists to suggest that Defendants were generally aware of complaints about Plaintiff's interpersonal communications prior to her taking leave, but they did not decide to terminate her at that time. Instead, the decision was made only after Plaintiff exercised her leave. This, among all the other evidence discussed herein, is sufficient to permit an inference of "but for" causation assuming that such a standard applies.

In their reply brief, Defendants for the first time argue that they are entitled to summary judgment because there is an absence of record evidence showing that a decision-maker was aware of Plaintiff's request to take FMLA leave at the time of the decision to terminate her employment. At the threshold, this argument fails because the Court disregards arguments made for the first time in a reply brief, which by definition Plaintiff has not had the chance to address. Moreover, the record is more than sufficient to show that at least Makrides, one of the central decision-makers in relation to Plaintiff's termination, was aware of Plaintiff's request for leave, as he repeatedly asked her to push that leave back. Also, Makrides claims that multiple managers and others expressed a desire to not have Plaintiff return from leave, which

suggests that they were aware of her being on and therefore necessarily requesting leave.

Thus, for all of the same reasons that Plaintiff established a *prima facie* case of Title VII discrimination, and because Plaintiff was terminated one business day before she was scheduled to return to work from her maternity leave, the Court finds that Plaintiff has established a *prima facie* case of FMLA retaliation. *See Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1268 (11th Cir. 2008) (noting that being terminated while on FMLA leave evidences close temporal proximity for purposes of creating a genuine issue of material fact as to the causal connection).

With regard to Defendants' legitimate, non-retaliatory reason for terminating Plaintiff and the pretext analysis, the Court notes that it is the same as the above analysis with respect to Plaintiff's Title VII discrimination claim. In essence, Defendants' legitimate, non-retaliatory reason for terminating Plaintiff, that she had a bad attitude, is enough to put the onus on Plaintiff to present evidence of pretext. In producing evidence that (1) Defendants' reason for terminating Plaintiff's employment shifted more than once; (2) the decision-makers, Krumper and Makrides, both made hostile comments about Plaintiff's pregnancy; (3) Makrides attempted to delay Plaintiff's leave; (4) the oddity of the timing of Plaintiff's termination and Makrides finding out about Plaintiff's attitude problems; and (5) the fact that two of

the employees who had allegedly told Makrides about Plaintiff's attitude problem were unable to recall bringing this to his attention while Plaintiff was on leave, Plaintiff has proffered sufficient evidence to create a genuine issue of material fact as to whether Defendants' justification for terminating Plaintiff is mere pretext.

Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment with respect to Count III be **DENIED** and that Plaintiff's claim for FMLA retaliation be allowed to proceed.

## III.   RECOMMENDATION

For the above reasons, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment [42] be **DENIED**, and that Plaintiff's claims be allowed to proceed. **IT IS FURTHER RECOMMENDED** that Plaintiff's Motion for Partial Summary Judgment [39] be **DENIED**.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 24th day of May, 2017.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

91